904 P.2d 1044

STATE of New Mexico, ex rel., Robert M. SCHWARTZ, Second Judicial District Attorney, Petitioner,

v.

Hon. Roderick T. KENNEDY, Judge of the Metropolitan Court, Respondent,

and

Greg Baca and Ray Holguin, Real Parties in Interest.

No. 22904.

Supreme Court of New Mexico.

Oct. 18, 1995.

Robert M. Schwartz, District Attorney, Steven S. Suttle, Assistant Chief Deputy District Attorney, Albuquerque, for Petitioner.

Tom Udall, Attorney General, Frederic S. Nathan, Jr., Assistant Attorney General, Santa Fe, for Respondent.

Roderick T. Frechette, II, Albuquerque, for Real Parties in Interest.

Campbell, Pica, Olson & Seegmiller, Paul DeMuro, Albuquerque, Freedman, Boyd, Daniels, Peifer, Hollander, Guttman & Goldberg, P.A., Gary Nelson, Albuquerque; for NMCDLA.

## OPINION

FRANCHINI, Justice.

1. In this case we answer the question whether a conviction for driving while intoxicated (DWI), NMSA 1978, § 66–8–102 (Repl. Pamp.1994), following the revocation of the defendant's driver's license in a civil proceeding for failing or refusing a chemical test for blood-alcohol content administered pursuant to the Implied Consent Act, NMSA 1978, §§ 66–8–105 to –112 (Repl.Pamp.1994), constitutes double jeopardy. We conclude that double jeopardy is not implicated by this process because an administrative driver's license revocation under the Implied Consent Act does not constitute "punishment" for the purposes of the Double Jeopardy Clause.

### I. FACTS

2. In November 1994 Greg Baca and Gary Holguin were arrested for DWI, in separate incidents, by officers of the Albuquerque Police Department. Baca submitted to a breath test to determine his blood alcohol content. Because Baca's test revealed that his blood alcohol content was in excess of .08 percent, the Motor Vehicle Division (MVD) of the New Mexico Department of Transportation revoked his driver's license pursuant to the Implied Consent Act, § 66–8–112(F). Holguin refused to submit to a chemical test to determine his blood alcohol content. Because Holguin refused to take the test, the MVD revoked his driver's license pursuant to the Implied Consent Act, § 66–8–112(F).

3. Baca and Holguin were each charged with aggravated DWI, § 66–8–102(D).[1] These charges were dismissed by the Honorable Roderick T. Kennedy of the Bernallilo County Metropolitan Court on the grounds that the Double Jeopardy Clauses of the United States and New Mexico Constitutions prohibit the State from seeking to punish individuals twice in separate proceedings for a single act of driving while intoxicated, once by revoking their driver's licenses in administrative proceedings under the Implied Consent Act, and a second time in criminal prosecutions under Section 66–8–102.

4. On behalf of the State, Robert Schwartz, the Second Judicial District Attorney, petitioned this Court to issue a writ of superintending control to Judge Kennedy (Respondent), directing him to withdraw his dismissals of the charges against Baca and Holguin. The question whether double jeopardy prohibits the State from subjecting an accused drunk driver to both an administrative driver's license revocation proceeding and a criminal prosecution was briefed for the State by the Attorney General, by Baca and Holguin as the real parties in interest, and by the New Mexico Criminal Defense Lawyer's Association as amicus curiae for Respondent.

5. The parties presented oral argument on the petition June 14, 1995, and that same day we issued a writ from the bench ordering Respondent to vacate the dismissals and to reinstate the cases on his docket. This opinion contains the Court's rationale for granting the writ of superintending control.

## II. WRIT OF SUPERINTENDING CONTROL

■ 6. We first address the question why the Court entertained this petition for writ of superintending control. Baca and Holguin insist that the State should follow normal appellate procedure. Ordinarily the State would appeal Respondent's rulings to the district court. See SCRA 1986, 7–703 (Supp. 1995). In the event of an unfavorable ruling by the district court, it could appeal to the Court of Appeals, see SCRA 1986, 12–102(B) (Cum.Supp.1995), and eventually petition for writ of certiorari, see SCRA 1986, 12–502 (Cum.Supp.1995). Baca and Holguin argue that their cases are more appropriately reviewed through appeals, and therefore contend that this Court should not grant immediate review by way of writ. See SCRA 1986, 12–504(C)(1) (Cum.Supp.1995) ("If it appears to a majority of the court that the petition [for writ of superintending control] ... concerns a matter more properly reviewable by appeal ... it may be denied without a hearing.").

■ 7. This Court, under authority granted by the New Mexico Constitution, has "superintending control over all inferior courts." N.M. Const. art. VI, § 3. "The power of superintending control is the power to control the course of ordinary litigation in inferior courts." District Court v. McKenna, 118 N.M. 402, 405, 881 P.2d 1387, 1390 (1994) (quoting State v. Roy, 40 N.M. 397, 421, 60 P.2d 646, 661 (1936)), cert. denied, —— U.S. ——, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995). In Roy we observed:

The power of superintending control is an extraordinary power. It is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practically hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise.

---

1. Baca was charged under Section 66–8–102(D)(1), and Holguin was charged under Section 66–8–102(D)(3). Section 66–8–102(D) states:

D. Aggravated driving while under the influence of intoxicating liquor or drugs consists of a person who:
(1) has an alcohol concentration of sixteen one-hundredths or more in his blood or breath while driving any vehicle within this state;

(2) has caused bodily injury to a human being as a result of the unlawful operation of a motor vehicle while driving under the influence of intoxicating liquor or drugs; or
(3) refused to submit to chemical testing, as provided for in the Implied Consent Act [66–8–105 to 66–8–112 NMSA 1978], and in the judgment of the court, based upon evidence of intoxication presented to the court, the person was under the influence of intoxicating liquor or drugs.

40 N.M. at 422, 60 P.2d at 662 (emphasis added) (quoting Annotation, *Superintending Control and Supervisory Jurisdiction of the Superior Over the Inferior or Subordinate Tribunal,* 51 L.R.A. 33, 111 (Burdett A. Rich ed. 1901)); *see also McKenna,* 118 N.M. at 405, 881 P.2d at 1390 ("[O]ur jurisdiction under superintending control seemingly is boundless. . . .").

■ 8. We have traditionally limited our exercise of the power of superintending control to exceptional circumstances, such as cases in which "the remedy by appeal seems wholly inadequate . . . or where otherwise necessary to prevent irreparable mischief, great, extraordinary, or exceptional hardship[, or] costly delays and unusual burdens of expense." *McKenna,* 118 N.M. at 405, 881 P.2d at 1390 (alterations in original) (quoting *State ex rel. Transcontinental Bus Serv., Inc. v. Carmody,* 53 N.M. 367, 378, 208 P.2d 1073, 1080 (1949) (citation omitted)). Nonetheless, we may exercise our power of superintending control "even when there is a remedy by appeal, where it is deemed to be in the public interest to settle the question involved at the earliest moment." *State ex rel. Townsend v. Court of Appeals,* 78 N.M. 71, 74, 428 P.2d 473, 476 (1967); *see also State Racing Comm'n v. McManus,* 82 N.M. 108, 110, 476 P.2d 767, 769 (1970) (holding that questions "of great public interest and importance" may require this Court to use its power of superintending control).

9. The question whether the State is barred from prosecuting an individual for DWI (DWI) once the individual has been subjected to an administrative hearing for driver's license revocation based on the same offense as the criminal charge is one of great public importance requiring the use of our power of superintending control. New Mexico has a serious problem with drunk drivers, with one of the highest rates in the nation of DWI-related fatalities. Our citizens are obviously concerned by this dangerous situation, and through their elected representatives have established a system providing punishment for drunk drivers along with remedial measures for the protection of the population. Respondent's ruling has placed this system in doubt. Under Respondent's ruling, the State would essentially be unable to prosecute defendants charged with DWI because in almost every case the driver's license revocation hearing precedes the corresponding criminal prosecution. Trial courts throughout the state are in a position of uncertainty regarding how to proceed with DWI prosecutions, and some courts have chosen to follow Respondent's lead by dismissing such cases on double jeopardy grounds. In order to provide a prompt and final resolution to this troubling question we agreed to consider the petition for writ of superintending control.

## III. DOUBLE JEOPARDY ANALYSIS

10. New Mexico's two-tier approach to DWI cases came about as a result of federal efforts to encourage states to decrease the prevalence of drunk drivers on the nation's highways. In 1983, Congress established a program that allowed the Secretary of Transportation to "make grants to those ·States which adopt and implement effective programs to reduce traffic safety problems resulting from persons driving while under the influence of alcohol." 23 U.S.C. § 408(a) (1988). To qualify for a basic incentive grant, a State must adopt a program providing for the prompt suspension of the driver's license of any individual whom a law enforcement officer has probable cause to stop for an alcohol-related traffic offense, and who is determined by a chemical test to be intoxicated or who refuses to submit to such a chemical test. 23 C.F.R. § 1309.5(a)(1) (1995). The legislatures of thirty-seven states, perhaps inspired by the availability of federal funding for alcohol-traffic-safety programs, have provided for the administrative suspension or revocation of an individual's license to drive when the individual has been arrested for DWI and has either refused to take or failed a chemical test. Respondent, however, ruled that this scheme, in which individuals suspected of drunk driving are subject to having their driver's licenses revoked in an administrative proceeding, as well as criminal prosecution for the same underlying act, violates the Double Jeopardy Clauses of the Fifth Amendment of the United States Constitution and Article II, Section 15 of the New Mexico Constitution.

11. We note that Respondent is not alone in his ruling. Trial courts in over a dozen states, as well as at least one Ohio Court of Appeals panel, have also concluded that this scheme violates the federal Double Jeopardy Clause. *See State v. Gustafson,* No. 94 C.A. 232, 1995 WL 387619 (Ohio Ct.App. 7 Dist., June 27, 1995) (unpublished opinion, subject to Ohio Sup.Ct.R. for Reporting Ops. R.2 (Anderson 1995)), *appeal allowed,* 73 Ohio St.3d 1427, 652 N.E.2d 800 (1995); *but see State v. Miller,* No. 2–94–32, 1995 WL 275770 (Ohio Ct.App. 3 Dist., May 12, 1995) (holding that trial court may prosecute defendant for driving under the influence of alcohol following administrative license revocation imposed for testing over the legal limit without violating Double Jeopardy Clause) (unpublished opinion, subject to Ohio Sup.Ct.R. for Reporting Ops. R.2 (Anderson 1995)); *see also Drunk Driving Defense Succeeds in More States,* 95 Law.Wkly. USA 422 (May 22, 1995) (listing cases).

■ 12. Most appellate courts that have considered the question, however, have concluded that the scheme does not violate the Double Jeopardy Clause. *See, e.g., United States v. Bulloch,* 994 F.2d 844 (8th Cir.1993) (table) (text available in Westlaw, 1993 WL 177690); *State v. Zerkel,* 900 P.2d 744, 746 (Alaska Ct.App.1995); *State v. Nichols,* 169 Ariz. 409, 413–414, 819 P.2d 995, 999–1000 (Ct.App.), *review denied* (Ariz. Dec. 3, 1991); *Baldwin v. Department of Motor Vehicles,* 35 Cal.App.4th 1630, 42 Cal.Rptr.2d 422, 430 (1995); *Ellis v. Pierce,* 230 Cal.App.3d 1557, 282 Cal.Rptr. 93, 95–96, *review denied* (Sept. 4, 1991); *Freeman v. State,* 611 So.2d 1260, 1261 (Fla.Ct.App.1992) (per curiam), *review denied,* 623 So.2d 493 (Fla.), *and cert. denied,* —— U.S. ——, 114 S.Ct. 415, 126 L.Ed.2d 361 (1993); *State v. Higa,* 79 Hawai'i 1, 7, 897 P.2d 928, 934 (1995); *State v. Maze,* 16 Kan.App.2d 527, 825 P.2d 1169, 1174 (1992); *Butler v. Department of Pub. Safety and Corrections,* 609 So.2d 790, 796 (La. 1992); *State v. Savard,* 659 A.2d 1265, 1268 (Me.1995); *Johnson v. State,* 95 Md.App. 561, 622 A.2d 199, 205–06 (1993); *State v. Hanson,* 532 N.W.2d 598, 602 (Minn.Ct.App.), *review granted* (Minn. Aug. 9, 1995); *State v. Young,* 3 Neb.App. 539, 530 N.W.2d 269, 278, *review sustained,* (Neb. May 11, 1995);

*Schreiber v. Motor Vehicles Div.,* 104 Or. App. 656, 802 P.2d 706, 706 (per curiam), *review denied,* 311 Or. 266, 810 P.2d 855 (1991); *State v. Strong,* 158 Vt. 56, 605 A.2d 510, 514 (1992). The question before this Court obviously is the subject of nationwide controversy. After reviewing the Supreme Court's recent opinions concerning the Double Jeopardy Clause, we conclude that the courts that have found that administrative license revocations are punitive have misread those Supreme Court opinions. To the contrary, for the reasons discussed below, driver's license revocations pursuant to the Implied Consent Act are not "punishment" for the purposes of double jeopardy analysis.

### A. General Principles of Double Jeopardy Analysis.

■ 13. The Fifth Amendment provides "... nor shall any person be subject for the same offense to be twice put in jeopardy of life and limb...." U.S. Const. amend. V. The New Mexico Constitution similarly provides "... nor shall any person be twice put in jeopardy for the same offense...." N.M. Const. art. II, § 15. Due to the similarity of the Federal and State Double Jeopardy Clauses, this Court consistently has construed and interpreted the state clause as providing the same protections offered by the federal clause. *See Swafford v. State,* 112 N.M. 3, 7 n. 3, 810 P.2d 1223, 1227 n. 3 (1991); *State v. Rogers,* 90 N.M. 604, 606, 566 P.2d 1142, 1144 (1977). Therefore, when we refer to the "Double Jeopardy Clause" in the context of this case, our analysis is identical for both the federal and state clause. We reserve the question, however, whether the New Mexico Double Jeopardy Clause, under circumstances other than the multiple punishment doctrine, provides greater protection than the federal clause.

■ 14. The Double Jeopardy Clause "protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense." *United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989); *see also Swaf-*

*ford,* 112 N.M. at 7, 810 P.2d at 1227 (same (quoting *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969))). Here we are concerned with the third of these protections, the protection against multiple punishments. As the Ninth Circuit Court of Appeals has recently noted, "at its most fundamental level [the Double Jeopardy Clause] protects an accused against . . . repeated attempts to exact one or more punishments for the same offense." *United States v. $405,089.23 U.S. Currency,* 33 F.3d 1210, 1215 (9th Cir.1994), *opinion amended on denial of rehearing,* 56 F.3d 41 (9th Cir.), *and petition for cert. filed,* 64 U.S.L.W. (U.S. Aug. 28, 1995). The Double Jeopardy Clause not only protects against the imposition of two punishments for the same offense, but also protects criminal defendants against being twice placed in jeopardy for such punishment. *Witte v. United States,* ── U.S. ──, ──, 115 S.Ct. 2199, 2204, 132 L.Ed.2d 351 (1995) ("[T]he Double Jeopardy Clause 'prohibits merely punishing twice, or attempting a second time to punish criminally for the same offense.'") (quoting *Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938)).

 15. The Supreme Court has held that the Double Jeopardy Clause protects the accused from multiple punishments in separate proceedings for the same offense. *Department of Revenue v. Kurth Ranch,* 511 U.S. ──, ──, 114 S.Ct. 1937, 1945, 128 L.Ed.2d 767 (1994) ("A defendant convicted and punished for an offense may not have a nonremedial civil penalty imposed against him for the same offense in a separate proceeding."). Multiple punishment analysis thus entails three factors: (1) whether the State subjected the defendant to separate proceedings; (2) whether the conduct precipitating the separate proceedings consisted of one offense or two offenses; and (3) whether the penalties in each of the proceedings may be considered "punishment" for the purposes of the Double Jeopardy Clause.

**B. Whether the Administrative Revocation Hearing and the Criminal Prosecution are Separate Proceedings.**

 16. We first address the question whether the administrative revocation hearing and the criminal prosecution are separate proceedings. This Court has recognized that an administrative proceeding to revoke a person's driver's license for refusal to submit to a chemical test "is entirely separate and distinct from the proceeding to determine the guilt or innocence of the person" as to the crime of DWI. *In re McCain (Commissioner of Motor Vehicles v. McCain),* 84 N.M. 657, 662, 506 P.2d 1204, 1209 (1973). The revocation hearing and the criminal action are parallel actions. The civil action is pursued independently of the criminal action, the two actions are tried at different times before different factfinders, and the actions are resolved by separate judgements. "The Supreme Court has made clear that parallel actions, instituted at about the same time and involving the same criminal conduct, constitute *separate* proceedings for double jeopardy purposes." *$405,089.23 U.S. Currency,* 33 F.3d at 1217. Accordingly, "a civil action aimed at exacting a penalty and a criminal prosecution arising out of the same offense constitute two separate proceedings when pursued separately and concluded at different times." *Savard,* 659 A.2d at 1267 (citing *Kurth Ranch,* 511 U.S. at ── n. 21, 114 S.Ct. at 1947 n. 21). The administrative license revocation and criminal prosecution are pursued separately and concluded at different times. Therefore, for the purposes of double jeopardy analysis, we conclude that a criminal prosecution for DWI is a separate proceeding from the action taken to suspend the defendant's driver's license.

**C. Whether Violation of the Implied Consent Act and Violation of Section 66-8-102 are Separate Offenses.**

 17. The second factor under multiple punishment analysis is whether the conduct precipitating the revocation hearing and the criminal prosecution consists of one offense or two offenses. We apply the test established in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), to determine whether the two statutory violations are one offense for double jeopardy purposes. *See Swafford,* 112 N.M. at 8, 810 P.2d at 1228 (adopting *Block-*

*burger* test). In *Blockburger,* the Supreme Court stated that:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact the other does not.

*Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182; *see also United States v. Dixon,* 509 U.S. 688, —— – ——, 113 S.Ct. 2849, 2859–60, 125 L.Ed.2d 556 (1993) (reaffirming use of *Blockburger* same-elements test for determining what constitutes same offense for double jeopardy purposes). The *Blockburger* test focuses the inquiry on whether each statute requires proof of an element that is not contained in the other. If each statute requires proof of an element not contained in the other, then the offenses are two separate crimes and double jeopardy does not bar multiple punishment. *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182; *Dixon,* 509 U.S. at ——, 113 S.Ct. at 2856.

18. In one of the cases dismissed by Respondent, the defendant refused to submit to a chemical test; in the other case, the defendant failed the chemical test. We analyze these situations independently to determine whether each statute requires proof of an additional fact that the other does not.

■ 19. We first examine Holguin's case, in which the suspected drunk driver refused to submit to a chemical test. The Implied Consent Act, § 66–8–112(F), sets out the elements that the hearing officer must find before revoking the driver's license of a person who has refused to submit to a chemical test.[2] The hearing officer must find that the law enforcement officer had reasonable grounds to believe the driver was driving a motor vehicle while under the influence of intoxicating liquor; that the driver was arrested; and that the driver refused to submit to the test upon request of the law enforcement officer after the law enforcement officer advised the driver that his or her failure to submit to the test could result in the revocation of the driver's privilege to drive.

20. The DWI statute provides that a person may be convicted of aggravated driving while under the influence of intoxicating liquor if the trial court finds that the person "refused to submit to chemical testing, as provided for in the Implied Consent Act" and that the person was under the influence of intoxicating liquor. Section 66–8–102(D)(3). A violation of Section 66–8–102(D)(3) is predicated on a failure to submit to a chemical test as required under the Implied Consent Act, with the additional requirement that the court must find that the person refusing the chemical test was in fact driving under the influence of intoxicating liquor. The civil revocation statute, § 66–8–112(F), does not require proof of an element not contained in the aggravated DWI charge, § 66–8–102(D)(3). We conclude that Section 66–8–112(F) and Section 66–8–102(D)(3) constitute the same offense under the *Blockburger* same-elements test.

■ 21. In the Baca case, the defendant failed the chemical test. The Implied Consent Act, § 66–8–112(F), provides that the hearing officer may revoke the driver's license of a person if the officer finds that the law enforcement officer had reasonable grounds to believe the driver was driving a

2. Section 66–8–112(F) provides:

> F. The department shall enter an order sustaining the revocation or denial of the person's license or privilege to drive if the department finds that:
>
> (1) the law enforcement officer had reasonable grounds to believe the driver was driving a motor vehicle while under the influence of intoxicating liquor or drug;
>
> (2) the person was arrested;
>
> (3) this hearing is held no later than ninety days after notice of revocation; and
>
> (4) the person either refused to submit to the test upon request of the law enforcement officer after the law enforcement officer ad-vised him that his failure to submit to the test could result in the revocation of his privilege to drive or that a chemical test was administered pursuant to the provisions of the Implied Consent Act and the test results indicated an alcohol concentration of eight one-hundredths or more if the person is twenty-one years of age or older or an alcohol concentration of two one-hundredths or more if the person is less than twenty-one years of age.
>
> If one or more of the elements set forth in Paragraphs (1) through (4) of this subsection are not found by the department, the person's license shall not be revoked.

motor vehicle while under the influence of intoxicating liquor; that the driver was arrested; that a chemical test was administered pursuant to the provisions of the Implied Consent Act; and the test results indicated an alcohol concentration of eight one-hundredths or more if the person is over twenty-one years old. The DWI statute, § 66–8–102(C), provides that a person may be convicted of driving while under the influence of intoxicating liquor if the person is over twenty-one years old and is shown to have had an alcohol concentration of eight one-hundredths or more in his or her blood or breath. The elements of these two offenses are identical; the criminal charge does not require proof of facts which the civil revocation action would not have required to be proven. Accordingly, we conclude that the criminal charge for DWI under Section 66–8–102(C) is based on the same offense underlying a Section 66–8–112(F) driver's license revocation action.

### D. Whether Driver's License Revocation Under the Implied Consent Act is Punishment for the Purposes of the Double Jeopardy Clause.

22. Our determinations that the license revocation hearing and criminal prosecution for DWI are separate proceedings, and that license revocation under the Implied Consent Act and criminal prosecution for DWI are the same offense, do not end our analysis. The Double Jeopardy Clause bars multiple *punishments* for the same offense in separate proceedings. We now direct our discussion to the third factor in multiple punishment analysis: whether an implied consent driver's license revocation is "punishment" for the purposes of the Double Jeopardy Clause.

23. Traditionally, jeopardy does not attach in proceedings in which only a civil sanction can be imposed, because "the risk to which the Clause refers is not present in proceedings that are not 'essentially criminal.'" *Breed v. Jones*, 421 U.S. 519, 528, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975). Thus a legislature "may impose both a criminal and a civil sanction in respect to the same act or omission" without violating the Double

Jeopardy Clause. *Helvering v. Mitchell*, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938); *see also United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 359, 104 S.Ct. 1099, 1103, 79 L.Ed.2d 361 (1984) (same); *United States v. Ward*, 448 U.S. 242, 250, 100 S.Ct. 2636, 2642, 65 L.Ed.2d 742 (1980) (same).

24. In *United States v. Halper*, 490 U.S. 435, 446, 109 S.Ct. 1892, 1900, 104 L.Ed.2d 487 (1989), the Supreme Court addressed the questions "whether and under what circumstances a civil penalty may constitute punishment for the purposes of the Double Jeopardy Clause." *Halper* concerned a manager of a medical services provider who made sixty-five false claims to Medicare, causing the government to overpay the company $585. *Id.* at 437, 109 S.Ct. at 1895. The manager was convicted on sixty-five counts of violating the federal criminal false claims statute, 18 U.S.C. § 287 (1988), and received a sentence of two years imprisonment and a fine of $5,000. *Id.* The government subsequently sued the manager under a similar civil false claims statute, 31 U.S.C. §§ 3729–3731 (1982 & Supp. II 1984), seeking fines of $2,000 per count, for a total monetary sanction of $130,000. *Halper*, 490 U.S. at 438, 109 S.Ct. at 1896.

25. In *Halper*, the Supreme Court decided that double jeopardy analysis based on the distinction between criminal and civil proceedings is an approach that is "not well suited to the context of the 'humane interests' safeguarded by the Double Jeopardy Clause's proscription of multiple punishments." *Id.* at 447, 109 S.Ct. at 1901. The Court explained:

This constitutional protection is intrinsically personal. Its violation can be identified only by assessing the character of the actual sanctions imposed on the individual by the machinery of the state.

In making this assessment, the labels "criminal" and "civil" are not of paramount importance. It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties.... [T]he determination whether a

given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that penalty may be fairly said to serve. Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment.

These goals are familiar. We have recognized in other contexts that punishment serves the twin aims of retribution and deterrence. Furthermore, "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." From these premises, it follows that a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term. We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution.

*Id.* at 447–49, 109 S.Ct. at 1901–02 (footnotes and citations omitted).

26. The Supreme Court concluded that the fine of $130,000 was "a sanction overwhelmingly disproportionate to the damages" the manager had caused. *Id.* at 449, 109 S.Ct. at 1902. The penalty bore "no rational relation to the goal of compensating the Government for its loss, but rather appear[ed] to qualify as 'punishment' in the plain meaning of the word," *id.*, and thus constituted a second punishment in violation of double jeopardy, *id.* at 452, 109 S.Ct. at 1903. The Court stated, however, that the test applied in *Halper* was directed to "the rare case, the case such as the one before [the Court], where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused." *Id.* at 449, 109 S.Ct. at 1902. This proportionality or "compensation for loss" analysis thus appears to be limited to the "rare case" in

which the government imposes a criminal penalty and a civil monetary penalty that is not rationally related to the government's loss. *See, e.g., Manocchio v. Kusserow,* 961 F.2d 1539, 1542 (11th Cir.1992) (holding that *Halper*'s analysis contrasting government's loss with monetary damages does not apply when monetary damages are not awarded); *Higa,* 897 P.2d at 932–33 (holding that *Halper* test, comparing civil penalty and the government loss, does not apply in case challenging criminal prosecution for DWI on double jeopardy grounds following administrative revocation of driver's license); *Johnson,* 622 A.2d at 205 (holding that *Halper* only "applies to instances where the government attempts to extract from a person who has committed a punishable act, preceded or followed by criminal prosecution, a monetary penalty 'related to the goal of making the government whole'") (quoting *Halper,* 490 U.S. at 451, 109 S.Ct. at 1903).

27. For example, in *Department of Revenue v. Kurth Ranch* the Supreme Court addressed the question whether the Double Jeopardy Clause prevented the State of Montana from prosecuting an individual for possession of marijuana with intent to sell and later imposing a tax on the drugs at a rate of ten percent of the value of the drugs or $100 per ounce of marijuana, whichever was greater. 511 U.S. at ——–——, 114 S.Ct. at 1941–42. The critical issue before the Court was whether Montana's drug tax constituted a second punishment under the Double Jeopardy Clause for conduct already punished criminally. *Id.* at ——, 114 S.Ct. at 1944. The Court noted that:

[T]ax statutes serve a purpose quite different from civil penalties, and *Halper*'s method of determining whether the exaction was remedial or punitive "simply does not work in the case of a tax statute." Subjecting Montana's drug tax to *Halper*'s test for civil penalties is therefore inappropriate.

*Id.* at ——, 114 S.Ct. at 1948 (quoting with approval *id.* at 1950 (Rehnquist, C.J., dissenting)). Accordingly, the Court did not apply the "compensation for loss" test used in *Halper* to determine whether the tax was punitive, but rather looked to whether the tax

"depart[ed] so far from normal revenue laws as to become a form of punishment." *Id.*

28. Just as the "compensation for loss" test is an inappropriate standard to apply for judging the punitive nature of a tax, it likewise is inappropriate for determining whether a nonmonetary civil penalty such as administrative license revocation is punishment for double jeopardy purposes. We conclude, however, that although the test set out in *Halper* does not apply to the present case, the general principles espoused in *Halper* do inform our determination whether a particular nonmonetary civil penalty is "punishment." *See id.* at ——, 114 S.Ct. at 1946; *Manocchio*, 961 F.2d at 1542; *Higa*, 897 P.2d at 933. Thus, in order to determine whether the revocation of a driver's license under the Implied Consent Act is punishment for double jeopardy purposes, we must make a "particularized assessment of the penalty imposed and the purposes that penalty may be fairly said to serve." *Halper*, 490 U.S. at 448, 109 S.Ct. at 1901. If the penalty may be fairly characterized only as a deterrent or as retribution, then the revocation is punishment; if the penalty may be fairly characterized as remedial, then it is not punishment for the purposes of double jeopardy analysis. *Id.* at 448–49, 109 S.Ct. at 1901–02.

29. We now examine the procedure and penalties under the Implied Consent Act to determine the purposes those penalties might fairly be said to serve. Under the Act, when a person is arrested for DWI, the arresting officer may request that the person submit to a chemical test for the purpose of determining the alcohol content of his or her blood. Section 66–8–107. If the driver refuses to permit chemical testing, or is over twenty-one years old and submits to a chemical test and has a result that indicates a blood-alcohol concentration of .08 or more, or is under twenty-one years old and submits to a chemical test and has a result that indicates a blood-alcohol concentration of .02 or more, the officer must serve the driver with immediate written notice of revocation and of right to a hearing by the MVD. Section 66–8–111.1. At the time of notice the officer takes the person's driver's license and issues a temporary license valid for twenty days. If the person requests a hearing, the temporary license remains valid until the date the MVD issues the order following that hearing. *Id.*

30. The law enforcement officer then sends the person's driver's license to the MVD along with a signed statement stating the officer's reasonable grounds to believe the arrested person had been driving a motor vehicle in New Mexico while under the influence of intoxicating liquor and that the person either refused to submit to a chemical test after being advised that failure to submit could result in revocation of his or her privilege to drive, or submitted to a chemical test and the test results exceeded the statutory limits for blood-alcohol content. Section 66–8–111(B)–(C). The MVD revokes the person's driving privilege upon receipt of the officer's statement, or if the person has requested a hearing, upon receipt of the hearing officer's ruling that revocation is proper. *See* Section 66–8–112. The revocation is for a period of ninety days if the driver is over twenty-one and failed the chemical test, § 66–8–111(C)(1), for a period of six months if the driver is under twenty-one and failed the chemical test, § 66–8–111(C)(2), for a period of one year if the person had previously had his or her driver's license revoked under the Implied Consent Act, § 66–8–111(C)(3), or for a period of one year if the person refused to take the chemical test, § 66–8–111(B). If the person requests a hearing and his or her driver's license is revoked following that hearing, the decision of the hearing officer may be appealed to the district court. Section 66–8–112(G).

31. Drivers who lose their license for the first time under the Implied Consent Act for the first time may apply for a limited license thirty days after the date of revocation if they provide the MVD with proof of insurance, proof of employment or enrollment in school, and proof of enrollment in an approved DWI course and an approved alcohol screening program. NMSA 1978, § 66–5–35(B) (Repl.Pamp.1994). The revoked license may be reinstated following the term of revocation upon application to the MVD and the payment of a fee of $100. NMSA 1978, § 66–5–33.1 (Repl.Pamp.1994).

32. In short, the penalty imposed on Baca for failing the chemical test for blood-alcohol content was the revocation of his driver's license for a period of ninety days. *See* Section 66–8–111(C)(1). Holguin's license was revoked for one year for refusing to take the chemical test. *See* Section 66–8–111(B). Each of the defendants is subject to a $100 fee for reinstatement of his driver's license upon completion of their respective terms of revocation. *See* Section 66–5–33.1. In order to ascertain whether these sanctions are punitive we must look at the purposes that the sanctions actually serve. *Halper,* 490 U.S. at 447 n. 7, 109 S.Ct. at 1901 n. 7. We make this determination by evaluating the government's purpose in enacting the legislation, rather than evaluating the effect of the sanction on the defendant. *See Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 396 (1995) ("What counts ... is the purpose and design of the statutory provision, its remedial goal and purposes, and not the resulting consequential impact ... that may inevitably, but incidentally, flow from it."). As the Supreme Court stated in *Kurth Ranch,* "whether a sanction constitutes punishment is not determined from the defendant's perspective, as even remedial sanctions carry the 'sting of punishment.'" 511 U.S. at —— n. 14, 114 S.Ct. 1937, 1945 n. 14 (quoting *Halper,* 490 U.S. at 447 n. 7, 109 S.Ct. at 1901 n. 7).

33. We believe it significant that the operation of automobiles on public highways is an activity that is regulated by the government. The government regulates many activities, including driving, participation in government programs such as Medicare, and participation in certain professions such as the practice of law or medicine. A critical element of this government regulation is the requirement that participants obtain licenses to pursue the regulated activity or occupation. As one court has stated:

The rationale for this system of regulation is that the public is exposed to an unacceptable risk of harm if the activity or occupation is performed incompetently, recklessly, dishonestly, or with intent to injure. Under these regulatory schemes, a person must obtain a license to pursue the regulated activity or occupation, and the government possesses the power to revoke the license of someone whose conduct demonstrates his or her unfitness to continue in that activity or occupation....

In many instances, the conduct that demonstrates a person's unfitness to pursue the regulated activity or occupation is also potentially criminal. Nevertheless, courts have traditionally declared that administrative action to revoke a license is distinct from any possible criminal prosecution, and administrative revocation of the person's license is not considered punishment for a crime.

*Zerkel,* 900 P.2d at 752 (footnote omitted).

34. When an individual fails to adhere to the standards set by the government for participation in a regulated activity or occupation, the government generally may bar the individual from participation in that activity or occupation without implicating double jeopardy, so long as the sanction reasonably serves regulatory goals adopted in the public interest. *See Emory v. Texas State Bd. of Medical Examiners,* 748 F.2d 1023, 1026 (5th Cir.1984) ("[R]evocation of privileges voluntarily granted is 'characteristically free of the punitive criminal element.'") (quoting *Helvering,* 303 U.S. at 399 n. 2, 58 S.Ct. at 633 n. 2). By revoking a conditionally granted license because of noncompliance with the conditions governing its issuance, the government intends to protect the public from licensees who are unfit to participate in the regulated activity or occupation. *See, e.g., In re Nelson,* 79 N.M. 779, 784, 450 P.2d 188, 193 (1969) (per curiam) (disciplinary action taken against attorney was for "the protection of the public, the profession, and the administration of justice, and not the punishment of the person disciplined"); *United States v. Hudson,* 14 F.3d 536, 541–42 (10th Cir.1994) (disbarment of banking officials from further banking activities for mismanagement and illegal operation of several banks was "a means of protecting the integrity of the banking system and the interests of the depositors," and served "a legitimate remedial purpose"); *United States v. Furlett,* 974 F.2d 839, 844 (7th Cir.1992) (trading bar on commodities broker accused of fraudulent commodities trading served "to ensure the integrity of the markets and pro-

tect[ ] them from people like [the defendant]," and thus was remedial rather than punitive); *Manocchio*, 961 F.2d at 1542 (exclusion of physician from participation in Medicare programs for making fraudulent claim was remedial); *United States v. Bizzell*, 921 F.2d 263, 267 (10th Cir.1990) (debarment of employee from participation in federal housing program for filing false statements was "strictly remedial"); *Loui v. Board of Medical Examiners*, 78 Hawai'i 21, 889 P.2d 705, 711 (1995) (suspension of doctor's medical license for one year after conviction for attempted sexual abuse and kidnapping was "designed to protect the public from unfit physicians" and served "legitimate nonpunitive governmental objectives"); *Alexander v. Louisiana State Bd. of Medical Examiners*, 644 So.2d 238, 244 (La.Ct.App. 1994) (suspension of doctor's medical license after conviction for bank robbery was designed to protect public and was not punishment for purposes of double jeopardy), *cert. denied*, 649 So.2d 423 (La.), *cert. denied*, —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995); *Cocco v. Maryland Comm'n on Medical Discipline*, 384 A.2d 766, 768–69 (Md.Ct. Spec.App.1978) ("[D]isciplinary proceedings against a professional have the unique purpose of protecting the public from the results of a professional's improper conduct, incompetence or unscrupulous practices."), *aff'd in part, rev'd in part sub nom. Unnamed Physician v. Commission on Medical Discipline*, 285 Md. 1, 400 A.2d 396, *cert. denied*, 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979); *In re Oxman*, 496 Pa. 534, 437 A.2d 1169, 1172 (1981) ("[T]he primary purpose of professional disciplinary proceedings is to protect the public."), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982). Thus courts have repeatedly held that revocation of a license for violation of the laws governing the licensed activity or occupation is not "punishment," but rather is remedial insofar as it serves the interests of enforcing regulatory compliance and protecting the public.

35. The New Mexico state government regulates the activity of driving on the state's highways in the interest of the public's safety and general welfare. *Johnson v. Sanchez*, 67 N.M. 41, 48, 351 P.2d 449, 453 (1960). The suspension of an individual's license to drive based on failure of a chemical test for blood-alcohol content or refusal to take the chemical test serves the legitimate nonpunitive purpose of protecting the public from the dangers presented by drunk drivers and helps enforce regulatory compliance with the laws governing the licensed activity of driving. *See, e.g., Bierner v. State Taxation and Revenue Dep't*, 113 N.M. 696, 699, 831 P.2d 995, 998 (Ct.App.1992) (stating that the Implied Consent Act protects the "public by promptly removing from the highways those who drive while intoxicated"); *Ellis*, 282 Cal. Rptr. at 94 ("Appellate courts have repeatedly described the goals of the statute as twofold: the immediate purpose is to obtain the best evidence of blood-alcohol content, and the long-range purpose is to reduce highway injuries by inhibiting intoxicated persons from driving."); *Freeman*, 611 So.2d at 1261 ("[T]he purpose of the statute providing for revocation of a driver's license upon conviction of a licensee for driving while intoxicated is to provide an administrative remedy for public protection and not for punishment of the offender."); *Higa*, 897 P.2d at 933 ("[T]he purpose of the administrative revocation process is not to 'punish' those in [the defendant's] position; it is to safeguard the public and reduce traffic fatalities caused by those driving under the influence of alcohol."); *Maze*, 825 P.2d at 1174 ("Our State's interest is to foster safety by temporarily removing from public thoroughfares those licensees who have exhibited dangerous behavior, which interest is grossly different from the criminal penalties that are available in a driving under the influence prosecution."); *Butler*, 609 So.2d at 797 ("The statute's primary effect is remedial; it removes those drivers from our state highways who have been proven to be reckless or hazardous."); *Young*, 530 N.W.2d at 278 ("The purpose of enacting the license revocation procedure under [the Implied Consent Law] was to protect the public by getting people with drinking propensities off the road...."); *Strong*, 605 A.2d at 513 ("The summary suspension scheme serves the rational remedial purpose of protecting public safety by quickly removing potentially dangerous drivers

from the roads."). We conclude that the administrative driver's license revocation provision of the Implied Consent Act may be fairly characterized as remedial, and therefore it is not punishment for the purposes of double jeopardy analysis.

36. Respondent and others, however, stress that license revocation is also punitive in nature. They therefore conclude that license revocation constitutes punishment for the purposes of double jeopardy analysis. Respondent emphasizes the phrase from *Halper*, "[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment." 490 U.S. at 448, 109 S.Ct. at 1902. He contends that the sections of the Implied Consent Act providing for the revocation of a driver's license if the driver either refuses to take a chemical test or if the results of the chemical test show a blood-alcohol content of .08 or greater serve the purposes of punishment insofar as they deter individuals from DWI. Respondent further contends that our appellate courts have recognized the deterrent purpose of the Implied Consent Act in cases such as *McKay v. Davis*, 99 N.M. 29, 30, 653 P.2d 860, 861 (1982) (stating that "[t]he Implied Consent Act is intended to deter driving while intoxicated and to aid in discovering and removing the intoxicated driver from the highway"); *Bierner*, 113 N.M. at 699, 831 P.2d at 998 (stating that administrative driver's license revocations further "the purpose of punishing and deterring violations of Section 66–8–102(A)"); and *Cordova v. Mulholland*, 107 N.M. 659, 660, 763 P.2d 368, 369 (Ct.App.) (stating that purpose of Implied Consent Act "is to deter individuals from driving while under the influence and endangering the lives and property of others"), *cert. denied*, 107 N.M. 546, 761 P.2d 424 (1988). Respondent concludes that administrative driver's license revocation under the Implied Consent Act is punitive because the sanction serves the purpose of deterring individuals from driving while intoxicated and thus cannot be said to be solely remedial. *See Gustafson*, 1995 WL 387619, at *12 (holding that existence of a deterrent purpose in Ohio's implied consent law compelled finding that

sanction of license revocation was punishment for purposes of double jeopardy).

37. It is incontrovertible that the sanction of driver's license revocation will have some deterrent effect on drunk drivers. *See, e.g., Mackey v. Montrym*, 443 U.S. 1, 18, 99 S.Ct. 2612, 2621, 61 L.Ed.2d 321 (1979) ("[T]he very existence of the summary sanction of [driver's license suspension] serves as a deterrent to drunken driving."); *Zerkel*, 900 P.2d at 756 ("It is obvious that deterrence of misconduct will be one practical effect of any regulatory scheme that allows the government to revoke a license to drive motor vehicles or pursue a livelihood."); *Savard*, 659 A.2d at 1268 ("[W]e acknowledge that any [driver's license] suspension may have a deterrent effect on the law-abiding public...."). However, the fact that the regulatory scheme has some incidental deterrent effect does not render the sanction punishment for the purposes of double jeopardy analysis. As one court has noted,

> It is obvious that deterrence of misconduct will be one practical effect of any regulatory scheme that allows the government to revoke a license that authorizes a person to drive motor vehicles or pursue a livelihood. But this deterrent purpose does not mean that administrative revocation of these licenses is "punishment" for purposes of the double jeopardy clause.

*Zerkel*, 900 P.2d at 756; *see also Nichols*, 819 P.2d at 998 ("[T]he fact that a statute designed primarily to serve remedial purposes incidentally serves the purposes of punishment as well does not mean that the statute results in punishment for double jeopardy purposes."); *Butler*, 609 So.2d at 797 ("While this court recognizes that the Implied Consent Law ... is to some extent deterrent and thus of a punitive nature because the statute attempts to discourage the repetition of criminal acts, this court has previously stated that the deterrence may be a valid objective of a regulatory statute.").

38. We do not believe that the Supreme Court, by stating that "a civil sanction that cannot be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or

deterrent purposes, is punishment," was holding that any administrative sanction that has a deterrent effect is punishment for double jeopardy purposes. We find the Supreme Court's opinion in *Kurth Ranch* instructive on this point. There the Court explained that monetary sanctions, such as fines or forfeitures, are qualitatively different from other types of administrative sanctions because of their distinctly punitive purposes. *Kurth Ranch*, 511 U.S. at ——, 114 S.Ct. at 1946 (distinguishing between fines, which are motivated by punitive purposes, and taxes, which are "motivated by revenue-raising rather than punitive purposes"). Administrative revocation of a license to engage in an activity or occupation is fundamentally different than a monetary sanction. The deterrent effect of administrative license revocation is incidental to the government's purpose of protecting the public from licensees who are incompetent, dishonest, or otherwise dangerous. Therefore, administrative license revocation generally is not motivated by a punitive purpose. A monetary sanction, on the other hand, *must* be described as having a deterrent or retributive purpose if it is not designed to compensate the government for its losses. *Halper*, 490 U.S. at 449–50, 109 S.Ct. at 1902.

39. The Court went on to state in *Kurth Ranch* that, "while a high tax rate *and deterrent purpose* lend support to the characterization of the drug tax as punishment, these features, in and of themselves, do not necessarily render the tax punitive." 511 U.S. at ——, 114 S.Ct. at 1947 (emphasis added). Thus the fact that the sanction in question may have some deterrent purpose does not, standing alone, render the sanction punishment for double jeopardy purposes.

■ 40. Because of the inherent differences between regulatory sanctions, such as license revocations, and monetary sanctions, such as fines or forfeitures, different standards of "punishment" should be applied when evaluating each distinct type of sanctions. As Professor Mary M. Cheh has explained,

In th[e] context [of nonmonetary civil sanctions], any definition of punishment must enable us to distinguish between punishment on the one hand and regulation or treatment on the other. Common experience and common sense dictate that a criminal conviction for aggravated assault should not bar a departmental proceeding to suspend the police officer for the same conduct, or that a conviction for bribery should not prevent the dismissal of a housing inspector for accepting bribes. Indeed, if we allowed the fact of a previous conviction to bar administrative action against an individual for the same conduct, felons would enjoy immunity from regulation to which others are not subject. Moreover, history suggests that the multiple punishments against which double jeopardy protects are those traditionally associated with criminal proceedings, such as fines and incarceration.

The conventional definition of punishment is thus inadequate here. That definition equates punishment with a burden imposed in response to an offense against legal rules and for the purpose of rehabilitation, deterrence, incapacitation, or retribution. Under that definition, regulation can be, and often is, punishment.

For double jeopardy purposes, then, sanctions will not be deemed to be "punishment" if they are reasonably calculated to constitute a rough compensatory remedy, reasonably serve regulatory goals adopted in the public interest, or provide treatment for persons unable to care for themselves. As *Halper* itself indicated, however, the courts actually must determine, on a case-by-case basis, whether a given burden is reasonably calculated to achieve and actually does achieve the non-punishment goals of recompense, regulation, or treatment.

Mary M. Cheh, *Constitutional Limits on Using Civil Remedies to Achieve Criminal Law Objectives: Understanding and Transcending the Criminal–Civil Law Distinction*, 42 Hastings L.J. 1325, 1378–79 (1991) (footnotes omitted).

41. We conclude that a regulatory sanction is not "punishment" simply because the sanction has some deterrent effect on those who might otherwise violate the standards of the regulatory body. The Alaska Court of

Appeals reached this same conclusion in a recent case, stating that

> when the legislature employs a licensing scheme to regulate a profession or an activity affecting the public health or safety, a statute that authorizes a regulatory body to revoke these licenses is "remedial" for double jeopardy purposes even though the law serves to deter licensees from engaging in conduct that is inconsistent with their duties as licensees or that is inconsistent with the public welfare.

*Zerkel,* 900 P.2d at 756. The Chief Judge of the Court, in a concurring opinion, explained that, "the sanction of suspending or revoking a license for noncompliance with the conditions governing its very issuance or continued existence necessarily bears an inherent relationship to the remedial goal of restoring regulatory compliance." *Id.* at 758 (Bryner, C.J., concurring). Accordingly, the revocation or suspension of a license issued by the government to engage in an activity or occupation will be deemed remedial "so long as the revocation or suspension is based on conduct that bears a direct relation to the government's regulatory goals." *Id.* at 757; *see also* Cheh, *supra,* at 1379 (opining that "sanctions will not be deemed to be 'punishment' if they ... reasonably serve regulatory goals adopted in the public interest").

42. Applying this standard to administrative driver's license revocation pursuant to the Implied Consent Act, we note that license revocation under the Act is based either on a test revealing the driver's excessive blood-alcohol level or refusal to take a chemical test for blood-alcohol content in violation of Section 66–8–107(A).[3] When a driver has failed a chemical test, he or she has been shown to have operated a vehicle under dangerous conditions. When a driver has refused to take a chemical test, he or she has failed to obey one of the conditions for licensure—willingness to consent to a chemical test for blood-alcohol content under certain circum-stances. The legislative goal in instituting the Implied Consent Act is to provide the public with safe roadways. *See* 23 U.S.C. § 408(a) (encouraging States to adopt and implement programs such as the Implied Consent Act in order "to reduce traffic safety problems resulting from persons driving while under the influence of alcohol"); 23 C.F.R. § 1309.2 (1995) (encouraging States to adopt and implement programs such as the Implied Consent Act in order to "significantly reduce crashes resulting from persons driving while under the influence of alcohol"). We conclude that—despite its deterrent effect—revocation of a person's driver's license based on the conduct of either failing a blood-alcohol test or refusing to take a chemical test under the circumstances stated in Section 66–8–107 is consistent with the government's goals in implementing the Implied Consent Act and is therefore remedial, not punitive, for the purposes of the Double Jeopardy Clause.

## IV. CONCLUSION

43. We hold that administrative driver's license revocation under the Implied Consent Act does not constitute "punishment" for the purposes of the Double Jeopardy Clause. Respondent is ordered to vacate the dismissals of the charges against Baca and Holguin of aggravated DWI and to reinstate the cases on his docket.

**44. IT IS SO ORDERED.**

BACA, C.J., and RANSOM, FROST and MINZNER, JJ., concur.

---

3. Section 66–8–107(A) reads in part:
 Any person who operates a motor vehicle within this state shall be deemed to have given consent ... to chemical tests of his breath or blood or both ... for the purpose of determining the drug or alcohol content of his blood if arrested for any offense arising out of the acts alleged to have been committed while the person was driving a motor vehicle while under the influence of an intoxicating liquor or drug.