**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number:_____**

**Filing Date: December 19, 2013**

**Docket No. 34,306**

**ROSE GRIEGO and KIMBERLY KIEL,**
**MIRIAM RAND and ONA LARA PORTER,**
**A.D. JOPLIN and GREG GOMEZ,**
**THERESE COUNCILOR and TANYA STRUBLE,**
**MONICA LEAMING and CECELIA TAULBEE, and**
**JEN ROPER and ANGELIQUE NEUMAN,**

       **Plaintiffs-Real Parties in Interest,**

**v.**

**MAGGIE TOULOUSE OLIVER,**
**in her official capacity as Clerk of Bernalillo County, and**
**GERALDINE SALAZAR,**
**in her official capacity as Clerk of Santa Fe County,**

       **Defendants-Real Parties in Interest,**

**and**

**STATE OF NEW MEXICO, ex rel.,**
**NEW MEXICO ASSOCIATION OF COUNTIES,**
**as the collective and organizational representative of**
**New Mexico's thirty-three (33) Counties, and**
**M. KEITH RIDDLE,**
**in his official capacity as Clerk of Catron County,**
**DAVE KUNKO,**
**in his official capacity as Clerk of Chaves County,**
**ELISA BRO,**
**in her official capacity as Clerk of Cibola County,**
**FREDA L. BACA,**
**in her official capacity as Clerk of Colfax County,**
**ROSALIE L. RILEY,**
**in her official capacity as Clerk of Curry County,**
**ROSALIE A. GONZALES-JOINER,**
**in her official capacity as Clerk of De Baca County,**

1

**DARLENE ROSPRIM,**
in her official capacity as Clerk of Eddy County,
**ROBERT ZAMARRIPA,**
in his official capacity as Clerk of Grant County,
**PATRICK Z. MARTINEZ,**
in his official capacity as Clerk of Guadalupe County,
**BARBARA L. SHAW,**
in her official capacity as Clerk of Harding County,
**MELISSA K. DE LA GARZA,**
in her official capacity as Clerk of Hidalgo County,
**PAT SNIPES CHAPPELLE,**
in her official capacity as Clerk of Lea County,
**RHONDA B. BURROWS,**
in her official capacity as Clerk of Lincoln County,
**SHARON STOVER,**
in her official capacity as Clerk of Los Alamos County,
**ANDREA RODRIGUEZ,**
in her official capacity as Clerk of Luna County,
**HARRIETT K. BECENTI,**
in her official capacity as Clerk of McKinley County,
**JOANNE PADILLA,**
in her official capacity as Clerk of Mora County,
**DENISE Y. GUERRA,**
in her official capacity as Clerk of Otero County,
**VERONICA OLGUIN MAREZ,**
in her official capacity as Clerk of Quay County,
**MOISES A. MORALES, JR.,**
in his official capacity as Clerk of Rio Arriba County,
**DONNA J. CARPENTER,**
in her official capacity as Clerk of Roosevelt County,
**DEBBIE A. HOLMES,**
in her official capacity as Clerk of San Juan County,
**MELANIE Y. RIVERA,**
in her official capacity as Clerk of San Miguel County,
**EILEEN MORENO GARBAGNI,**
in her official capacity as Clerk of Sandoval County,
**CONNIE GREER,**
in her official capacity as Clerk of Sierra County,
**REBECCA VEGA,**
in her official capacity as Clerk of Socorro County,
**ANNA MARTINEZ,**
in her official capacity as Clerk of Taos County,
**LINDA JARAMILLO,**
in her official capacity as Clerk of Torrance County,

2

**MARY LOU HARKINS,**
**in her official capacity as Clerk of Union County, and**
**PEGGY CARABAJAL,**
**in her official capacity as Clerk of Valencia County,**

  **Intervenors-Petitioners,**

**and**

**LYNN J. ELLINS,**
**in his official capacity as Clerk of Doña Ana County,**

  **Real Party in Interest,**

**and**

**HON. ALAN M. MALOTT,**

  **Respondent.**

**ORIGINAL PROCEEDING**

Sutin, Thayer & Browne, P.C.
Peter S. Kierst
Lynn E. Mostoller
Albuquerque, NM

ACLU of New Mexico
Laura Louise Schauer Ives
Alexandra Freedman Smith
Albuquerque, NM

American Civil Liberties Union Foundation
Elizabeth O. Gill
James D. Esseks
San Francisco, CA

Law Office of Lynn Perls
N. Lynn Perls
Albuquerque, NM

Wray & Girard, P.C.
Jane Katherine Girard
Albuquerque, NM

National Center for Lesbian Rights
Shannon P. Minter
Christopher F. Stoll
San Francisco, CA

Sanders & Westbrook, P.C.
Maureen A. Sanders
Albuquerque, NM

for Plaintiffs

Office of the Bernalillo County Attorney
Randy M. Autio, County Attorney
Peter S. Auh, Deputy County Attorney
Albuquerque, NM

Office of the Santa Fe County Attorney
Stephen C. Ross, County Attorney
Willie R. Brown, Assistant County Attorney
Santa Fe, NM

for Defendants

New Mexico Association of Counties and
the Intervening County Clerks
Steven Kopelman
Grace Philips
Santa Fe, NM

The Ivey-Soto Law Firm
Daniel A. Ivey-Soto
Albuquerque, NM

for Intervenors

Gary K. King, Attorney General
Scott Fuqua, Assistant Attorney General
Sean M. Cunniff, Assistant Attorney General
Santa Fe, NM

for Respondent

The Carrillo Law Firm, P.C.
Raul A. Carrillo, Jr.

Karen Elaine Wootton
Las Cruces, NM

for Amicus Curiae
Doña Ana County Clerk

Alliance Defending Freedom
James A. Campbell
Joseph E. La Rue
Scottsdale, AZ

Evie M. Jilek
Albuquerque, NM

for Amicus Curiae
New Mexico Legislators

Jenner & Block LLP
Paul M. Smith
Washington, DC

Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Beinvenu, LLP
Sarah Eileen Bennett
Santa Fe, NM

Caren Ilene Friedman
Santa Fe, NM

for Amici Curiae
American Psychological Association, New Mexico Psychological Association,
National Association of Social Workers, National Association of Social Workers New
Mexico, and New Mexico Pediatric Society

Office of the Santa Fe City Attorney
Eugene I. Zamora, City Attorney
Zachary A. Shandler, Assistant City Attorney
Santa Fe, NM

for Amicus Curiae
City of Santa Fe

University of New Mexico School of Law
Max Justin Minzner
George L. Bach, Jr.

Albuquerque, NM

for Amicus Curiae
Professors at University of New Mexico School of Law

Gay & Lesbian Advocates & Defenders
Mary Bonauto
Boston, MA

Daniel Yohalem
Santa Fe, NM

for Amici Curiae
Equality New Mexico, National Organization for Women Foundation, New Mexico
National Organization for Women, PFLAG New Mexico, Southwest Women's Law
Center, Freedom to Marry, Prosperity Works, American Veterans for Equal Rights-
Bataan Chapter, Transgender Resource Center of New Mexico, Human Rights Alliance,
Organizers in the Land of Enchantment, Media Literacy Project, New Mexico Lesbian
and Gay Lawyers Association, Anti-Defamation League, Pacific Association of Reform
Rabbis, Temple Beth Shalom of Santa Fe, The Unitarian Universalist Congregation of
Santa Fe, Rev. Talitha Arnold, Rev. Kathryn A. Schlechter, Rising Sun Ministries,
Metropolitan Community Church of Albuquerque

**OPINION**

**CHÁVEZ, Justice.**

**{1}**     "All persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness." N.M. Const. art. II, § 4.  These inherent rights, enjoyed by all New Mexicans, appear along with twenty-three other provisions known as the New Mexico Bill of Rights, which include the right to bear arms, freedom of speech, freedom of the press, freedom from unreasonable government searches and seizures, due process, and the equal protection of the laws. *See* N.M. Const. art. II, §§ 6, 10, 17, 18.  When government is alleged to have threatened any of these rights, it is the responsibility of the courts to interpret and apply the protections of the Constitution.  The United States Supreme Court explained the courts' responsibility as follows:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.  One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may

not be submitted to vote; they depend on the outcome of no elections.

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).  Thus, when litigants allege that the government has unconstitutionally interfered with a right protected by the Bill of Rights, or has unconstitutionally discriminated against them, courts must decide the merits of the allegation.  If proven, courts must safeguard constitutional rights and order an end to the discriminatory treatment.

**{2}**     Interracial marriages were once prohibited by laws in many states until the United States Supreme Court declared such laws unconstitutional and ordered an end to the discriminatory treatment.  *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("[R]estricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause.").  The same-gender couples in this case, all of whom are in long-term, committed relationships, some of whom have raised foster and adoptive children together, allege that they have a constitutional right under the Due Process and Equal Protection provisions of New Mexico's Bill of Rights to enter into civil marriages and to enjoy the concomitant legal rights, protections, and responsibilities of marriage.  Consistent with our constitutional responsibility to determine whether legislation offends the New Mexico Constitution, the question we must answer is whether the State of New Mexico may decline to recognize civil marriages between same-gender couples and therefore deprive them of the rights, protections, and responsibilities available to opposite-gender married couples without violating the New Mexico Constitution.

**{3}**     Although this question arouses sincerely-felt religious beliefs both in favor of and against same-gender marriages, our analysis does not and cannot depend on religious doctrine without violating the Constitution.[1]  *See* N.M. Const. art. II, § 11; *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("[O]ne religious denomination cannot be officially preferred over another.").  Instead we must depend upon legal principles to analyze the statutory and constitutional bases for depriving same-gender couples from entering into a purely secular civil marriage and securing the accompanying rights, protections, and responsibilities of New Mexico laws.  Our holding will not interfere with the religious freedom of religious organizations or clergy because (1) no religious organization will have to change its policies to accommodate same-gender couples, and (2) no religious clergy will be required to

---

[1]Every man [or woman] shall be free to worship God according to the dictates of his [or her] own conscience, and no person shall ever be molested or denied any civil or political right or privilege on account of his [or her] religious opinion or mode of religious worship.  No person shall be required to attend any place of worship or support any religious sect or denomination; nor shall any preference be given by law to any religious denomination or mode of worship.

N.M. Const. art. II, § 11.

solemnize a marriage in contravention of his or her religious beliefs. *See* NMSA 1978, § 28-1-9(B) & (C) (1969, as amended through 2004) (describing exemption of religious organizations from the New Mexico Human Rights Act).

**Summary**

**{4}**     We conclude that although none of New Mexico's marriage statutes specifically prohibit same-gender marriages, when read as a whole, the statutes have the effect of precluding same-gender couples from marrying and benefitting from the rights, protections, and responsibilities that flow from a civil marriage. Same-gender couples who wish to enter into a civil marriage with another person of their choice and to the exclusion of all others are similarly situated to opposite-gender couples who want to do the same, yet they are treated differently. Because same-gender couples (whether lesbian, gay, bisexual, or transgender, hereinafter "LGBT") are a discrete group which has been subjected to a history of discrimination and violence, and which has inadequate political power to protect itself from such treatment, the classification at issue must withstand intermediate scrutiny to be constitutional. Accordingly, New Mexico may neither constitutionally deny same-gender couples the right to marry nor deprive them of the rights, protections, and responsibilities of marriage laws, unless the proponents of the legislation—the opponents of same-gender marriage—prove that the discrimination caused by the legislation is "substantially related to an important government interest." *Breen v. Carlsbad Mun. Sch.*, 2005-NMSC-028, ¶ 13, 138 N.M. 331, 120 P.3d 413 (internal quotation marks and citation omitted).

**{5}**     The opponents of same-gender marriage assert that defining marriage to prohibit same-gender marriages is related to the important, overriding governmental interests of "responsible procreation and childrearing" and preventing the deinstitutionalization of marriage. However, the purported governmental interest of "responsible procreation and childrearing" is not reflected in the history of the development of New Mexico's marriage laws. Procreation has never been a condition of marriage under New Mexico law, as evidenced by the fact that the aged, the infertile, and those who choose not to have children are not precluded from marrying. In addition, New Mexico law recognizes the right of same-gender couples to raise children. NMSA 1978, § 32A-5-11 (1993) (recognizing parties who are eligible to adopt children); *see also Chatterjee v. King*, 2012-NMSC-019, ¶ 84, 280 P.3d 283 (Bosson, J., specially concurring) (recognizing the right of a former same-gender partner who supported both the child and her former partner to have standing to seek custody of the child). Finally, legislation must advance a state interest that is separate and apart from the classification itself. It is inappropriate to define the governmental interest as maintaining only opposite-gender marriages, just as it was inappropriate to define the governmental interest as maintaining same-race marriages in *Loving*. Therefore, the purported governmental interest of preventing the deinstitutionalization of marriage, which is nothing more than an argument to maintain only opposite-gender marriages, cannot be an important governmental interest under the Constitution.

**{6}**     We conclude that the purpose of New Mexico marriage laws is to bring stability and

order to the legal relationship of committed couples by defining their rights and responsibilities as to one another, their children if they choose to raise children together, and their property. Prohibiting same-gender marriages is not substantially related to the governmental interests advanced by the parties opposing same-gender marriage or to the purposes we have identified. Therefore, barring individuals from marrying and depriving them of the rights, protections, and responsibilities of civil marriage solely because of their sexual orientation violates the Equal Protection Clause under Article II, Section 18 of the New Mexico Constitution. We hold that the State of New Mexico is constitutionally required to allow same-gender couples to marry and must extend to them the rights, protections, and responsibilities that derive from civil marriage under New Mexico law.

**Procedural history**

**{7}**     A marriage license is "required under New Mexico law as evidence that a marriage fully complies with all requirements of the law." *Rivera v. Rivera*, 2010-NMCA-106, ¶ 19, 149 N.M. 66, 243 P.3d 1148. Therefore, denying marriage licenses to same-gender couples would be tantamount to denying them the right to enter into a civil marriage with all of its attendant legal rights, protections, and responsibilities. New Mexico County Clerks (Clerks) are delegated the responsibilities of issuing marriage licenses to couples who are qualified to enter into civil marriages and filing the licenses once the couples are married. NMSA 1978, § 40-1-10(A) (1905, as amended through 2013). The Doña Ana County Clerk voluntarily began issuing marriage licenses to same-gender couples on August 21, 2013. Several other Clerks did the same, while others did not do so until ordered by a court; yet others continued to decline to issue marriage licenses to same-gender couples. A number of lawsuits were initiated as a result of the Clerks' actions.

**{8}**     Plaintiffs filed their complaint in *Griego*, seeking a declaration "that it is unlawful to deny same-sex couples the freedom to marry on the basis of sex or sexual orientation because such denial deprives them of fundamental rights and liberties." They also sought a permanent injunction requiring, in part, that "Defendants implement and enforce all aspects of the state's marriage law . . . without discriminating on the basis of sex or sexual orientation" and that Defendants treat Plaintiffs "once married . . . [,] equally with all other married couples under the Constitution and laws of New Mexico."

**{9}**     On August 29, 2013, following an initial declaratory judgment in *Griego*, the New Mexico Association of Counties, as the organizational representative for the State's thirty-three Clerks, filed an unopposed motion to intervene based on a common question of law under Rule 1-024(B)(2) NMRA, stating their future intentions to "seek immediate review from the state Supreme Court." The Clerks asserted that they have a "need for an immediate ruling that is applicable statewide and that resolves the constitutional questions at the highest level of appellate review."

**{10}**     On September 3, 2013, the district court issued its final declaratory judgment stating that the refusal to issue marriage licenses to otherwise qualified same-gender couples

9

violated Article II, Section 18 of the New Mexico Constitution. On September 5, 2013, the Clerks filed, and we accepted, a verified petition for writ of superintending control. Prior to accepting the writ in this case, this Court had denied two separate verified petitions for writs of mandamus "without prejudice to the parties to pursue litigation of issues in the lower court with a right to request expedited review." *See Hanna v. Salazar*, No. 34,216 (non-precedential order, N.M. Sup. Ct. Aug 15, 2013); *Griego v. Oliver*, No. 34,227 (non-precedential order, N.M. Sup. Ct. Aug. 15, 2013). Both cases were subsequently decided in the district courts. *See State ex rel. Hanna v. Salazar*, No. D-0101-CV-2013-02182, Aug. 22, 2013; *Griego v. Oliver*, D-202-CV-2013-02757, Sept. 3, 2013. In addition, a number of other district courts have issued writs or orders requiring Clerks to issue marriage licenses to same-gender couples in New Mexico. *See State ex rel. Stark v. Martinez*, No. D-820-CV-2013-295, alternative writ of mandamus issued in the Eighth Judicial District Court on August 27, 2013 affecting Taos County; *State ex rel. Newton v. Stover*, No. D-132-CV-2013-00094, alternative writ of mandamus issued in the First Judicial District Court on August 29, 2013 affecting Los Alamos County; *Katz v. Zamarripa*, No. D-608-CV-2013-00235, final order and permanent injunction issued in the Sixth Judicial District Court on September 5, 2013 affecting Grant County. Other cases are awaiting the outcome of the petition for writ of superintending control that is presently before this Court.[2]

**Our exercise of superintending control is appropriate in this case**

{11}    Article VI, Section 3 of the New Mexico Constitution provides that "[t]he supreme court shall have . . . superintending control over all inferior courts; it shall also have power to issue . . . writs necessary or proper for the complete exercise of its jurisdiction and to hear and determine the same." When we deem it appropriate, we exercise our power of superintending control "to control the course of ordinary litigation in inferior courts . . . even when there is a remedy by appeal, where it is deemed to be in the public interest to settle the question involved at the earliest moment." *State ex rel. Schwartz v. Kennedy*, 1995-NMSC-069, ¶¶ 7-8, 120 N.M. 619, 904 P.2d 1044 (internal quotation marks and citations omitted).

{12}    In *Schwartz*, we exercised our discretion to decide a double jeopardy question that had created uncertainty in the courts "[i]n order to provide a prompt and final resolution to this troubling question." *Id.* ¶ 9. The Clerks urge us to exercise our power of superintending control as we did in *Schwartz* because they are also in a position of uncertainty regarding their responsibilities to issue same-gender marriage licenses.

---

[2]These cases include *Gering v. Garbagni*, No. D-1329-CV-2013-01715 (Sandoval County) and three cases brought by state legislators to challenge the validity of licenses already issued, in some cases where individual Clerks have issued marriage licenses to same-gender couples, even without a court order directing them to do so. *Sharer v. Ellins*, No. CV-2013-2061 (Doña Ana County); *Sharer v. Rivera*, No. D-412-CV-2013-00367 (San Miguel County); *Sharer v Carabajal*, No. D-1314-CV-2013-01058 (Valencia County).

**{13}** The record before us reflects the uncertainty described by the Clerks. At the time this petition was filed, eight New Mexico counties were issuing marriage licenses to same-gender couples, while twenty-four were not. By October 23, 2013, the date of oral argument before this Court, over 1,466 marriage licenses had been issued.

**{14}** We requested briefing to consider the merits of this case because (1) the parties complied with this Court's order to pursue litigation in the lower courts and thereafter requested expedited review; (2) the varying positions of the courts and the Clerks regarding the issuance of licenses to same-gender couples created chaos statewide; (3) the Clerks are performing a duty under state law and they express uncertainty and disagreement about how to proceed; (4) there are currently more than 1,400 same-gender couples whose New Mexico marriages may not be recognized for the purpose of receiving federal benefits due to the lingering uncertainty about the law in New Mexico; and (5) there is a high volume of cases ruled upon by district courts and pending throughout New Mexico regarding the common question of law regarding whether same-gender marriage is lawful in New Mexico. Once we agreed to hear this case we invited and accepted amicus curiae briefs to ensure that the important issues before us were adequately briefed and argued to this Court. We affirm the district courts and grant the writ of superintending control.

**The real parties in interest who seek to marry**

**{15}** The real parties in interest in this case (Plaintiffs) are six same-gender couples from four New Mexico counties who wish to marry and who were the plaintiffs in the Second Judicial District Court case of *Griego v. Oliver*, No. D-202-CV-2013-02757. Plaintiffs include accountants, interior designers, real estate brokers, teachers, small business owners, and engineers at our national laboratories. Many are active in community service; they volunteer and work for non-profit organizations, and serve on municipal boards and city councils. They have formed stable family units involving mutual protection and support, and together they have raised children, cared for aging parents, and tried to have those family units formally recognized through both legal and ceremonial means.

**{16}** As of August 16, 2013, the date they filed their second amended complaint, Plaintiffs Rose Griego (Rose) and Kimberly Kiel (Kim) had been in a committed relationship for eight years; Plaintiffs Miriam Rand (Miriam) and Ona Lara Porter (Ona) had been in a committed relationship for twenty-five years; Plaintiffs Aaron Joplin (A.D.) and Greg Gomez (Greg) had been in a committed relationship for seven years; Plaintiffs Therese Councilor (Therese) and Tanya Struble (Tanya) had been in a committed relationship for twenty-three years and own a business together; Plaintiffs Monica Leaming (Monica) and Cecilia Taulbee (Cecilia) had been in a committed relationship for fifteen years; and Plaintiffs Jen Roper (Jen) and Angelique Neuman (Angelique) had been in a committed relationship for the past twenty-one years.

**{17}** Several of the Plaintiff couples raise or have raised children and grandchildren together. Miriam and Ona raised three children together during the course of their twenty-

five year relationship. Their youngest daughter, who was only three when Miriam and Ona combined households, legally changed her surname to Porter-Rand to reflect the importance of both of the mothers in her life. Their middle daughter, Cherif, is physically disabled and can no longer care for her fourteen-year-old daughter, who has cerebral palsy. Ona has adopted Cherif's daughter and Miriam plans to initiate a second-parent adoption. Until the adoption is finalized, Miriam does not have automatic legal authority to make important decisions for her granddaughter, whom she is helping to raise. Monica and Cecilia raised Cecilia's three children to adulthood during their fifteen-year relationship; all three children consider Monica as another parent, and she considers them to be her children. Similarly, Kim's college-aged children refer to Rose as their step-mother. A.D. and Greg have no biological children, but they maintain a relationship with their former long-term foster child they raised who is now an adult, who calls them both Dad. Jen and Angelique adopted three preschool-age brothers from the custody of the Children, Youth & Families Department and have raised them together. The two youngest boys live with their mothers, while the eldest left home after enlisting in the United States Army following his graduation from high school. All three brothers support their mothers' efforts to legally marry.

**{18}**     The inability to legally marry has adversely impacted several of the Plaintiff couples who have endured significant familial and medical hardships together. On one occasion, when Rose was hospitalized, the hospital refused to provide Kim with any information about Rose's condition or treatment until Rose's other family members arrived, despite the fact that it was Kim who took Rose to the hospital. Miriam and Ona cared for each other's aging parents, and both women's mothers passed away within one year of each other. However, Miriam was not eligible for bereavement leave when Ona's mother died, and Ona was not eligible for bereavement leave when Miriam's mother died. Also, due to restrictive next-of-kin and family-only limitations on visitation and medical decision-making, Miriam and Ona were forced to pretend to be sisters. Jen was diagnosed with an aggressive form of brain cancer in late 2012, and doctors told her she had eighteen months to live. After surgery to partially remove the tumor, Jen suffered a stroke, which impaired some of her physical and cognitive functions. At the time Plaintiffs filed their complaint, Jen had been placed in an assisted living facility, and Angelique was spending several hours each day with her. Because Jen and Angelique could not legally marry, Angelique could not collect spousal benefits as a result of Jen's disability, despite their twenty-one year relationship.

**When read as a whole, New Mexico marriage statutes prohibit same-gender marriages**

**{19}**     We begin our legal discussion with an analysis of New Mexico marriage statutes to determine whether the statutes authorize or prohibit same-gender marriages. If the statutes can be interpreted to authorize same-gender marriages, including all of the rights, protections, and responsibilities that come with being married, the constitutional questions raised by Plaintiffs are irrelevant. *See Chatterjee*, 2012-NMSC-019, ¶ 18 ("[W]e seek to avoid an interpretation of a statute that would raise constitutional concerns.").

**{20}**     Our principal goal in interpreting statutes is to give effect to the Legislature's intent.

*Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047. The Legislature first enacted our State's basic marriage statutes in 1862. Our analysis begins with NMSA 1978, Section 40-1-1 (1862-63), which provides that "[m]arriage is contemplated by the law as a civil contract, for which the consent of the contracting parties, capable in law of contracting, is essential." "Each couple desiring to marry pursuant to the laws of New Mexico shall first obtain a license from a county clerk of this state and following a ceremony conducted in this state file the license for recording in the county issuing the license." Section 40-1-10(A). Although the references to the phrase "contracting parties" in Section 40-1-1 and the term "couple" in Section 40-1-10(A) are gender-neutral and suggest that same-gender marriages may not be prohibited, we must read these phrases in context with other statutes relating to marriage. *See State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 ("[A] statutory subsection may not be considered in a vacuum, but must be considered in reference to the statute as a whole and in reference to statutes dealing with the same general subject matter." (internal quotation marks and citation omitted)).

**{21}**　As early as 1905, the Legislature also developed forms "[t]o insure a uniform system of records of all marriages hereafter contracted, and the better preservation of said record for future reference. . . ." 1905 N.M. Laws, ch. 65, § 7. The forms included an application for marriage license, a marriage license, and a marriage certificate. *Id*. § 8. The application and marriage license did not contain any gender- specific designations. However, the marriage certificate required signatures from both the "groom" and the "bride." *Id*. "Under the rules of statutory construction, we first turn to the plain meaning of the words at issue, often using the dictionary for guidance." *New Mexico Attorney Gen. v. New Mexico Pub. Regulation Comm'n*, 2013-NMSC-042, ¶ 26, 309 P.3d 89. In the context of marriage, "groom" and "bride" are gender-specific terms. *See The American Heritage Dictionary* 230 (5th ed. 2011) (defining "bridegroom" as "[a] man who is about to be married or has recently been married" and "bride" as "[a] woman who is about to be married or has recently been married").

**{22}**　In 1961, the Legislature amended the application form for a marriage license to specifically call for a "Male Applicant" and a "Female Applicant." NMSA 1978, § 40-1-18 (1953, amended 1961). The marriage certificate also required the signatures of a groom and a bride. The amendment of the application form and the fact that the marriage forms have remained the same since 1961 suggest that the Legislature intended a civil marriage to be between a man and a woman. The consanguinity provisions contained in NMSA 1978, Section 40-1-7 (1876, as amended through 2013) that void marriages between a male and certain female relatives and between a female and certain male relatives also suggest that the Legislature did not intend to permit same-gender couples to marry. Finally, the provisions in NMSA 1978, Chapter 40, Article 2 (1901, as amended through 1973) that define the rights of married persons generally refer to "husband and wife"[3]; the provisions in NMSA 1978, Chapter 40, Article 3 (1907, as amended through 1997) address the property rights of

---

[3]*See, e.g.*, §§ 40-2-1, -8.

13

"husband and wife"[4]; and the provisions in NMSA 1978, Chapter 40, Article 4 (1901, as amended through 2011) address the dissolution of marriage between "husband and wife."[5] *See Garcia v. Jeantette*, 2004-NMCA-004, ¶ 18, 134 N.M. 776, 82 P.3d 947 ("'Either party,' as that term is used in Section 40-4-7(A), can logically only refer to the parties to the underlying domestic relations proceeding, that is, husband and wife."). "Husband" and "wife" are gender-specific terms. *See Black's Law Dictionary* 810, 1735 (9th ed. 2009) (defining "husband" as "[a] married man" and "wife" as "[a] married woman").

{23}    Thus, we conclude that a mix of gender-neutral and gender-specific terminology in the domestic relations statutes does not mean that the Legislature intended to authorize marriage between same-gender couples. On the contrary, we conclude that the statutory scheme reflects a legislative intent to prohibit same-gender marriages. *See Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 953 (Mass. 2003) (Because state law is "silent as to the consanguinity of male-male or female-female marriage applicants . . . the Legislature did not intend that same-sex couples be licensed to marry."); *Li v. State*, 110 P.3d 91, 96 (Or. 2005) (en banc) (state law specifies that marriage is a civil contract entered into by a male and a female); *Baker v. State*, 744 A.2d 864, 869 (Vt. 1999) (state law specifies that marriage licenses specify "bride," which is defined as a woman, and "groom," which is defined as a man).

{24}    Even if we were to conclude that the gender-neutral language in Sections 40-1-1 and 40-1-10 authorizes same-gender marriages, we could not avoid the constitutional challenge raised by Plaintiffs. Plaintiffs "seek vindication not only of their constitutional right to marry, but their entitlement to all the essential protections and responsibilities attendant on marriage." Interpreting our statutes to authorize committed same-gender couples to enter into civil marriage will grant them the rights and privileges available to opposite-gender married couples in approximately one thousand statutes and federal regulations that refer to a person's marital status, thereby avoiding a constitutional challenge on that basis. *See United States v. Windsor*, ___ U.S. ___, ___, ___, 133 S. Ct. 2675, 2694, 2695-96 (2013) (striking down Section 3 of the federal Defense of Marriage Act (DOMA), Pub. L. No. 104-199, 110 Stat. 2419 (1996) (codified at 1 U.S.C. § 7 (1977); 28 U.S.C. § 1738C (1997)), and holding that the federal government must extend federal marital benefits to same-gender couples lawfully married in states that recognize same-gender civil marriages[6]). However,

---

[4]*See, e.g.*, §§ 40-3-1, -12.

[5]*See, e.g.*, § 40-4-3.

[6]Since the filing of *United States v. Windsor*, ___ U.S. ___, 133 S. Ct. 2675, federal agencies have engaged in a pattern and practice of limiting the extension of benefits to same-gender couples who have a valid marriage certificate, declining to extend the benefits to same-gender couples in a civil union or domestic partnership. This pattern and practice is what prompted New Jersey to declare its civil union legislation unconstitutional. *Garden State Equal. v. Dow*, ___ A.3d ___, ___, 2013 WL 6153269, at *1 (N.J. Super. L. 2013);

14

the phrasing of many of New Mexico's statutes limits the concomitant state-based rights, protections, and responsibilities of marriage to opposite-gender married couples. *See* nn.3 & 4, *supra*. Were we to interpret the marriage statutes as permitting same-gender marriages, we would still have to decide whether depriving same-gender married couples of concomitant state-based marital rights, protections, and responsibilities violates the Equal Protection Clause of Article II, Section 18 of the New Mexico Constitution. Therefore, despite the lack of an express legislative prohibition against same-gender marriage, we will analyze the constitutionality of denying same-gender couples the right to marry and depriving them of "the essential protections and responsibilities attendant on marriage."

**Plaintiffs' constitutional challenge is based on equal protection and a claim that the right to marry is a fundamental right**

**{25}** Plaintiffs contend that New Mexico's laws denying same-gender couples the same right to a civil marriage as that enjoyed by opposite-gender couples violates the Equal Protection Clause of Article II, Section 18 of the New Mexico Constitution because it discriminates against them on the basis of either their sex or their sexual orientation. *See id.* ("No person shall be . . . denied equal protection of the laws."). Plaintiffs also contend that the right to marry is a fundamental right and the State's interference with the exercise of this right also violates the New Mexico Constitution. Plaintiffs do not claim that New Mexico's marriage laws violate the United States Constitution.

**{26}** We will address the equal protection challenge before discussing the fundamental rights issue. We interpret the equal protection challenge to raise two questions: (1) do committed same-gender couples have a constitutional right to be married, and (2) do they have a constitutional right to the rights, protections, and responsibilities afforded to married opposite-gender couples?

**{27}** We apply the equal protection approach announced in *Breen* to answer these two constitutional questions. This approach generally requires us to first determine whether the legislation creates a class of similarly-situated individuals and treats them differently. 2005-NMSC-028, ¶ 10. If it does, we then determine the level of scrutiny that applies to the challenged legislation and conclude the analysis by applying the appropriate level of scrutiny to determine whether the legislative classification is constitutional.

**Same-gender couples who seek to marry are situated similarly to opposite-gender**

---

*affirmed by Garden State Equal. v. Dow*, ___ A.3d ___, ___, 2013 WL 5687193, at *1 (N.J. 2013). Governor Christie withdrew his appeal of the Superior Court decision, thus leaving the court's decision making same-gender marriage legal in New Jersey the controlling law. *See* Kate Zernike and Marc Santora, *As Gays Wed in New Jersey, ChristieEnds Court Fight*, N.Y. Times, Oct. 21, 2013, http://www.nytimes.com/2013/10/22/nyregion/christie-withdraws-appeal-of-same-sex-marriage-ruling-in-new-jersey.html.

**couples who seek to marry**

**{28}** Plaintiffs contend that they are similarly situated to opposite-gender couples who seek to be married because they also are in committed and loving relationships. Some of these Plaintiffs are raising families, similar to many opposite-gender couples who also seek to be married. They assert that recognition of their status as married couples will provide them with a stable framework within which to care for each other and raise families, similar to opposite-gender couples who want to marry and raise their families.

**{29}** The opponents of same-gender marriage concede that same-gender couples may be similarly situated to opposite-gender couples with respect to their love and commitment to one another, but they contend that these similarities are beside the point. The opponents contend that the government's overriding purpose for recognizing and regulating marriage is "responsible procreation and child-rearing," which they describe as the ability of a married couple to naturally produce children. In addition, because same-gender couples do not have the natural capacity to create children through their sexual relationships, the opponents contend that same-gender couples cannot be similarly situated to opposite-gender couples.

**{30}** To determine whether same-gender and opposite-gender couples who seek to marry are similarly situated with respect to NMSA 1978, Chapter 40, "we must look beyond the classification to the purpose of the law." *New Mexico Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, ¶ 40, 126 N.M. 788, 975 P.2d 841 (*NARAL*) (internal quotation marks and citation omitted). None of the parties dispute the fact that children benefit from stable family relationships. However, the history of New Mexico's marriage statutes does not support the contention that the overriding purpose of Chapter 40 is "responsible procreation and childrearing." Our review of the marriage statutes dating back to 1862 has not revealed any language, either implicit or explicit, that requires applicants for a marriage license to attest to their ability or intention to conceive children through sexual relationships. Counsel for the opponents of same-gender marriage also cannot cite to any such language.

**{31}** Fertility has never been a condition of marriage, nor has infertility ever been a specific ground for divorce. Beginning in 1884, a divorce could only be granted on specific grounds, which at the time only included "adultery, cruel or inhuman treatment and abandonment." 1884 Compiled Laws of New Mexico, Title X, ch. II, § 998. In 1915, "impotency" was added as another specified ground for divorce, 1915 Compiled Laws of New Mexico, ch. LV, § 2773, but neither infertility nor unwillingness to have children has ever been specific grounds for divorce.

**{32}** Even assuming arguendo that procreation is the overriding purpose of the New Mexico marriage laws, same-gender and opposite-gender couples are still similarly situated, yet they are treated differently. Opposite-gender couples who are incapable of naturally producing children, or who simply do not intend to have children, are not prohibited from marrying, and they still benefit from concomitant marital rights, protections, and responsibilities. In addition, just as opposite-gender couples may adopt or have children

16

utilizing assisted reproduction, so too may same-gender couples. However, opposite-gender couples who adopt or have children utilizing assisted reproduction are not prohibited from marrying, and they and their families benefit from state-granted marital rights, protections, and responsibilities. Same-gender couples are prohibited from marrying, and they and their families are deprived of the rights, protections, and responsibilities available under our marriage laws, even if they choose to have a family by adoption or assisted reproduction.

**{33}** Procreation is not the overriding purpose of the New Mexico marriage laws. The purpose of the New Mexico marriage laws is to bring stability and order to the legal relationships of committed couples by defining their rights and responsibilities as to one another, their property, and their children, if they choose to have children. This purpose is self-evident from the structure of our laws. NMSA 1978, Chapter 40, Article 1 (1859, as amended through 2013) generally describes our marriage laws. Civil marriage is purely secular; it is a civil contract. Section 40-1-1. The civil contract must be solemnized during a ceremony by ordained clergy or certain other designated officials who are not ordained clergy. Section 40-1-2. With respect to children, the general marriage laws provide that "[a] child born to parents who are not married to each other has the same rights pursuant to the law as a child born to parents who are married to each other." Section 40-1-16(A).

**{34}** NMSA 1978, Chapter 40, Article 2 generally describes the rights of married persons. It begins by specifying that the "[h]usband and wife contract toward each other obligations of mutual respect, fidelity and support." Section 40-2-1. Other provisions in Article 2 describe in general terms marriage settlements or separation contracts, requiring that any such agreements be in writing. Section 40-2-4.

**{35}** NMSA 1978, Chapter 40, Article 3 defines the property rights of a married couple and establishes equality in property ownership by enacting the Community Property Act, NMSA 1978, §§ 40-3-6 to -17 (1973, as amended through 1997). Section 40-3-7. Gender-neutral language is used throughout the Community Property Act. *See* §§ 40-3-6 to -17. NMSA 1978, Chapter 40, Article 4 provides for the orderly dissolution of a marriage. *See* §§ 40-4-1 to -20. Finally, the Family Preservation Act, NMSA 1978, §§ 40-15-1 to -4 (2005), also supports our conclusion that the overriding purpose of our marriage laws is the stability of marriage for the benefit of married couples and their families. "The purpose of the Family Preservation Act is to confirm the state's policy of support for the family and to emphasize the responsibilities of parents and the state in the healthy development of children and the family as an institution." Section 40-15-2. These statutes do not indicate a legislative concern with whether a couple procreates. Instead, these statutes, when considered as a whole, evince an overriding concern with protecting the stability of family units, whether they are procreative or not.

**{36}** We conclude that same-gender couples who are in loving and committed relationships and want to be married under the laws of New Mexico are similarly situated to opposite-gender couples who likewise are in loving and committed relationships and want to be married. Other courts that have considered this issue have also found that same-gender

17

and opposite-gender couples who want to marry are similarly situated. In *In re Marriage Cases*, 183 P.3d 384 (Cal. 2008), the California Supreme Court concluded that the two classes are similarly situated because:

> Both groups at issue consist of pairs of individuals who wish to enter into a formal, legally binding and officially recognized, long-term family relationship that affords the same rights and privileges and imposes the same obligations and responsibilities. Under these circumstances, there is no question but that these two categories of individuals are sufficiently similar to bring into play equal protection principles that require a court to determine "'whether distinctions between the two groups justify the unequal treatment.'"

*Id*. at 435 n.54 (quoting *People v. Hofsheier*, 129 P.3d 29, 37 (Cal. 2006)), *superseded by constitutional amendment as stated in Strauss v. Horton*, 207 P.3d 48, 115 (Cal. 2009) and *Hollingsworth v. Perry*, ___ U.S. ___, ___, 133 S. Ct. 2652, 2659 (2013).

**{37}** In *Kerrigan v. Commissioner of Public Health*, 957 A.2d 407 (Conn. 2008), the opponents of same-gender marriages argued that same-gender couples are not similarly situated to opposite-gender couples because same-gender couples seek to marry someone of the same sex, unlike opposite-gender couples. *Id.* at 423-24. The Connecticut Supreme Court rejected this argument, noting that other than wanting to marry someone of the same sex, same-gender couples otherwise meet all of the eligibility requirements for marriage, including the public safety requirements of age and consanguinity. *Id*. at 424. In addition, same-gender couples "share the same interest in a committed and loving relationship as heterosexual persons who wish to marry, and they share the same interest in having a family and raising their children in a loving and supportive environment." *Id*.

**{38}** The Iowa Supreme Court advanced a similar rationale in recognizing that same-gender couples are similarly situated to opposite-gender couples.

> Therefore, with respect to the subject and purposes of Iowa's marriage laws, we find that the plaintiffs are similarly situated compared to heterosexual persons. Plaintiffs are in committed and loving relationships, many raising families, just like heterosexual couples. Moreover, official recognition of their status provides an institutional basis for defining their fundamental relational rights and responsibilities, just as it does for heterosexual couples. Society benefits, for example, from providing same-sex couples a stable framework within which to raise their children and the power to make health care and end-of-life decisions for loved ones, just as it does when that framework is provided for opposite-sex couples.

*Varnum v. Brien*, 763 N.W.2d 862, 883 (Iowa 2009). We are persuaded that the same analysis applies to same-gender couples in New Mexico who want to get married. Having

18

concluded that same-gender and opposite-gender couples who want to marry are similarly situated, we next consider the level of scrutiny to apply.

**Intermediate scrutiny applies because the legislation at issue affects a sensitive class**

**{39}** Three potential levels of scrutiny are available under an equal protection challenge. First, if the statutes treat a suspect class differently, the least deferential standard of review, strict scrutiny, applies, and the burden is on the party supporting the statutes to prove that the legislation furthers a compelling state interest. *Breen*, 2005-NMSC-028, ¶ 12. Second, if the statutes treat differently a sensitive class such as persons with a mental disability, an intermediate standard of review applies, which requires the party supporting the statutes to prove that the legislation is substantially related to an important governmental interest. *Id.* ¶ 28. Third, if the statutes in question are social or economic legislation that do not treat a suspect or sensitive class differently, the most deferential standard of review, rational basis, applies, and the burden is on the party challenging the statutes to prove that the legislation is not rationally related to a legitimate governmental purpose. *Id.* ¶ 11.

**{40}** Plaintiffs contend that strict scrutiny should be applied to their equal protection challenge because prohibiting their marriages denies same-gender couples rights based on their sex. They cite *NARAL*, 1999-NMSC-005, ¶ 43, to support their argument that New Mexico legislation which creates gender-based classifications must have a "compelling justification" to satisfy the Equal Rights Amendment to Article II, Section 18 of the New Mexico Constitution.

**{41}** We do not agree that the marriage statutes at issue create a classification based on sex. Plaintiffs have conflated sex and sexual orientation. The distinction between same-gender and opposite-gender couples in the challenged legislation does not result in the unequal treatment of men and women. On the contrary, persons of either gender are treated equally in that they are each permitted to marry only a person of the opposite gender. The classification at issue is more properly analyzed as differential treatment based upon a person's sexual orientation.

**{42}** The New Mexico Human Rights Act (NMHRA), NMSA 1978, §§ 28-1-1 to -15 (1953, as amended through 2007), was amended in 2003 to add "sexual orientation" as a class of persons protected from discriminatory treatment. 2003 N.M. Laws, ch. 383, § 2. "Sex" had already been a protected class. 2001 N.M. Laws, ch. 347, § 1. "Sexual orientation" is defined in the NMHRA as "heterosexuality, homosexuality or bisexuality, whether actual or perceived." Section 28-1-2(P). In this case, we are concerned with those individuals who want to marry someone of the same gender, whether they are homosexual, bisexual, or transgender. Other New Mexico legislation offers protection based on sexual orientation as well as gender. *See* NMSA 1978, § 29-21-2 (2009) (prohibiting profiling by law enforcement officers on the basis of sexual orientation as well as other characteristics); NMSA 1978, § 31-18B-2(D) (2007) (including sexual orientation as a protected status under the Hate Crimes Act, NMSA 1978, §§ 31-18B-1 to -5 (2003, as amended 2007)). The need

19

to add "sexual orientation" to these statutes would have been unnecessary if "sex" as a protected class encompassed an individual's sexual orientation. *See Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000) ("Congress's refusal to expand the reach of Title VII is strong evidence of congressional intent in the face of consistent judicial decisions refusing to interpret 'sex' to include sexual orientation.").

{43}     Many courts that have considered the issue have applied the equal protection analysis in same-gender marriage cases based upon sexual orientation, not gender. *See In re Marriage Cases*, 183 P.3d at 436-40 (declining to analyze the equal protection challenge on the basis of sex because the distinct class is more properly viewed as being based on sexual orientation); *Hernandez v. Robles*, 855 N.E.2d 1, 10-11 (N.Y. 2006) (same); *see also Lewis v. Harris*, 908 A.2d 196, 212-16 (N.J. 2006) (evaluating equal protection challenge in a same-gender marriage case on the basis of sexual orientation). Our analysis of sex discrimination cases has been gender- based, scrutinizing the historical discrimination against women. *NARAL*, 1999-NMSC-005, ¶¶ 36, 41, 47. For these reasons, we conclude that in a case involving same-gender marriage, the equal protection challenge should not be analyzed as a case involving sex discrimination, but must be analyzed as a case involving discrimination based on a person's sexual orientation.

**Classification on the basis of sexual orientation requires intermediate scrutiny**

{44}     Plaintiffs contend that even if the classification at issue is based on an individual's sexual orientation, such a classification should be treated as a suspect classification requiring strict scrutiny. A suspect class is "a discrete group 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Richardson v. Carnegie Library Rest., Inc.*, 1988-NMSC-084, ¶ 27, 107 N.M. 688, 763 P.2d 1153 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973), *overruled on other grounds by Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 36, 125 N.M. 721, 965 P.2d 305). Race, national origin, and alienage are considered suspect classifications. *Richardson*, 1988-NMSC-084, ¶ 27. In addition, we have treated gender-based statutory classifications as suspect. *See NARAL*, 1999-NMSC-005, ¶ 27.

{45}     In *NARAL*, we acknowledged that federal courts have analyzed gender discrimination cases by applying intermediate scrutiny, but we chose to apply a greater level of scrutiny. *Id.* ¶ 37. We held that legislation which involved gender-based classifications would be presumed to be unconstitutional, and the government would have the burden of establishing a compelling justification for the legislation. *Id.* ¶¶ 36, 43. A key rationale for applying strict scrutiny was the 1973 addition of the Equal Rights Amendment to Article II, Section 18 of the New Mexico Constitution, which added the language "[e]quality of rights under law shall not be denied on account of the sex of any person." *See NARAL*, 1999-NMSC-005, ¶ 29. Before this addition, Article II, Section 18 had only the language "[n]o person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws." N.M. Const. art. II, § 18 (1972). We concluded that

to honor the intent of the citizens of New Mexico to expand the guarantees of our Equal Protection Clause, we were obligated to apply a level of scrutiny greater than the one that was being applied by federal courts, particularly because the United States Constitution does not have a counterpart to New Mexico's Equal Rights Amendment. *NARAL*, 1999-NMSC-005, ¶¶ 29, 37 (quoting *Op. of the Justices to the House of Representatives*, 371 N.E.2d 426, 428 (Mass. 1977) ("'To use a standard . . . which requires any less than the strict scrutiny test would negate the purpose of the equal rights amendment and the intention of the people in adopting it.'")).

**{46}** Another key rationale for applying strict scrutiny to gender-based classifications was the history of invidious discrimination against women, including restrictions on their rights to vote, hold public office, *NARAL*, 1999-NMSC-005, ¶¶ 32-34, and other "early laws [that] continued to reflect the common-law view 'that women were incapable mentally of exercising judgment and discretion and were classed with children, lunatics, idiots, and aliens insofar as their political rights were concerned.'" *Id.* ¶ 34 (quoting *State v. Chaves de Armijo*, 1914-NMSC-021, ¶ 27, 18 N.M. 646, 140 P. 1123). We credited the Equal Rights Amendment with causing the amendment and repeal of many of these laws. *NARAL*, 1999-NMSC-005, ¶ 35. Based on this analysis, we concluded that the "Equal Rights Amendment is a specific prohibition that provides a legal remedy for the invidious consequences of . . . gender-based discrimination," and therefore "requires a searching judicial inquiry concerning state laws that employ gender-based classifications." *Id.* ¶ 36.

**{47}** In this case, the issue we must decide is whether a classification based on an individual's sexual orientation parallels classifications based on gender, race, national origin, and alienage, and whether it should therefore be treated as a suspect classification. The opponents of same-gender marriage argue that same-gender couples are not even a sensitive class because same-gender couples "possess political power that vastly exceeds their small percentage of the population," and therefore, if they do not qualify as a sensitive class, they cannot be considered a suspect class. These opponents illustrate the political power of same-gender couples by pointing to achievements that they have attained with respect to same-gender marriages[7]:

> The Democratic Party has included redefining marriage in its official party platform. *See* Platform Standing Comm., 2012 Democratic Nat'l Convention Comm., *Moving America Forward* . . . 18 (2012), *available at*

---

[7]"[T]his Court—or any court, trial or appellate—may take judicial notice of legislative facts by resorting to whatever materials it may have at its disposal establishing or tending to establish those facts." *Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶¶ 26, 25-28, 147 N.M. 583, 227 P.3d 73 (citing *Trujillo v. City of Albuquerque*, 1990-NMSC-083, ¶ 55, 110 N.M. 621, 798 P.2d 571 (Montgomery, J., concurring in part, dissenting in part) (*Trujillo I*)), *overruled in later appeal on other grounds by Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 36 (*Trujillo II*).

21

http://www.democrats.org/democratic-national-platform.

The President and his administration support same-sex marriage. *See* Josh Earnest, *President Obama Supports Same-Sex Marriage*, The White House Blog (May 10, 2012, 7:31 PM), http://www.whitehouse.gov/blog/2012/05/10/obama-supports-same-sex-marriage. [http://assets.dstatic.org/dnc-platform/2012-National-Platform.pdf.]

During the last five years, legislatures in seven United States jurisdictions—New Hampshire, Vermont, New York, the District of Columbia, Minnesota, Delaware, and Rhode Island—have voted to redefine marriage. *See Defining Marriage: Defense of Marriage Acts and Same-Sex Marriage Laws,* National Conference of State Legislatures ([current on] July 26, 2013), http://www.ncsl.org/issues-research/human-services/same-sex-marriage-overview.aspx.

Last year, the citizens of three States—Maine, Maryland, and Washington—decided to redefine marriage through a direct vote of the people. *See* Richard Socarides, *Obama and Gay Marriage: One Year Later*, The New Yorker (May 6, 2013), http://newyorker.com/online/blogs/newsdesk/2013/05/obama-and-gay-marriage-one-year-later.html.

**{48}** Focusing on the political powerlessness prong is a reasonable strategy for the opponents of same-gender marriage because whether same-gender couples (the LGBT community) are a discrete group who have been subjected to a history of purposeful unequal treatment is not fairly debatable. Until 1975, consensual sexual intimacy between persons of the same gender was prohibited and actively prosecuted in New Mexico courts under anti-sodomy laws. *See* NMSA 1953, § 40A-9-61 (1963) ((Vol. 6, 2d Repl. Pamp.), repealed, Laws 1975, ch. 109, § 8). Convictions for sodomy in New Mexico were upheld despite constitutional challenges to these laws. *See State v. Elliott*, 1976-NMSC-030, ¶ 9, 89 N.M. 305, 551 P.2d 1352 (reversing the Court of Appeals insofar as it held the sodomy statute unconstitutional). However, perhaps more importantly, as we previously noted in paragraph 42, *supra*, New Mexico has recently enacted legislation to prohibit discrimination against individuals based upon their sexual orientation, 2003 N.M. Laws, ch. 383, § 2; enacted legislation to prohibit law enforcement officers from profiling individuals based on their sexual orientation, § 29-21-2; and added sexual orientation as a protected class under hate crimes legislation, § 31-18B-2(D). None of this legislation would have been required if the LGBT community was not a discrete group which has experienced a history of purposeful unequal treatment and acts of violence.

**{49}** Refocusing on the contention that the LGBT community is not politically powerless, we recognize that they have had some recent political success regarding legislation

prohibiting discrimination against them. However, we also conclude that effective advocacy for the LGBT community is seriously hindered by their continuing need to overcome the already deep-rooted prejudice against their integration into society, which warrants our application of intermediate scrutiny in this case. *See Breen*, 2005-NMSC-028, ¶¶ 28-29 (applying intermediate scrutiny to legislation adversely affecting persons with mental disabilities because their political advocacy remains seriously hindered despite their gains in society). The political advocacy of the LGBT community continues to be seriously hindered, as evidenced by the uncontroverted difficulty in determining whether LGBTs are under-represented in positions of political power, because many of them keep their sexual orientation private to avoid hostility, discrimination, and ongoing acts of violence. *See* Richard M. Valelly, *LGBT Politics and American Political Development*, Annu. Rev. Polit. Sci. 2012. 15:313–32 (2012). FBI statistics show that the rates of hate crimes committed against individuals based on sexual orientation have remained relatively constant over the past two decades, although they have risen slightly in the past few years, both in absolute numbers and expressed as a percentage of all types of hate crimes. Fed. Bureau of Investigation, Uniform Crime Reports: Hate Crime Statistics 1996 through 2012, *available at* http://www.fbi.gov/about-us/cjis/ucr/ucr-publications. It is reasonable to expect that the need of LGBTs to keep their sexual orientation private also hinders or suppresses their political activity. *See Windsor v. United States*, 699 F.3d 169, 184-85 (2d Cir. 2012) ("their position 'has improved markedly in recent decades,' but they still 'face pervasive, although at times more subtle, discrimination . . . in the political arena.'" (quoting *Frontiero v. Richardson*, 411 U.S. 677, 685-86 (1973)).

**{50}** Although the LGBT community has had political success, they have also seen their gains repealed by popular referendums. *Romer v. Evans*, 517 U.S. 620 (1996) and *In re Marriage Cases* provide two good examples. In *Romer*, numerous municipalities in Colorado enacted ordinances that prohibited discrimination against gays and lesbians in housing, employment, education, public accommodations, and health and welfare services. 517 U.S. at 623-24. In response to the enactment of such ordinances, the voters of Colorado amended the Colorado Constitution to preclude the three branches of government at any level of state or local government from protecting gays and lesbians against discrimination. C.R.S.A. Const. art. 2, § 30b; *Romer*, 517 U.S. at 624. The constitutional amendment adopted by the voters reads:

> No Protected Status Based on Homosexual, Lesbian or Bisexual Orientation. Neither the State of Colorado, through any of its branches or departments, nor any of its agencies, political subdivisions, municipalities or school districts, shall enact, adopt or enforce any statute, regulation, ordinance or policy whereby homosexual, lesbian or bisexual orientation, conduct, practices or relationships shall constitute or otherwise be the basis of or entitle any person or class of persons to have or claim any minority status, quota preferences, protected status or claim of discrimination.

*Id*. (internal quotation marks omitted). In *Romer*, the United States Supreme Court

invalidated the Colorado constitutional amendment because it violated the Equal Protection Clause of the United States Constitution. *Id*. at 632-33. California provides another example. After the California Supreme Court filed its opinion in *In re Marriage Cases*, California voters passed Proposition 8, which amended the California Constitution to provide that "'[o]nly marriage between a man and a woman is valid or recognized in California.'" Cal. Const., Art. I, § 7.5; *Hollingsworth v. Perry*, ___ U.S. ___, ___, 133 S. Ct. 2652, 2659 (2013).

**{51}**     At the time this case was argued in October, 2013, only a minority of states had enacted laws identifying "sexual orientation" as a protected class for purposes of anti-discrimination laws.[8] Only six states had recognized the validity of and enacted legislation permitting same-gender marriages, or civil unions, at the time this opinion was filed: Delaware, 79 Del. Laws ch. 19 (2013); Minnesota, 2013 Minn. Sess. Law Serv. 74 (West); New Hampshire, 2009 N.H. Laws 60-66; New York, N.Y. Dom. Rel. Law § 10-a (Consol. 2011); Rhode Island, R.I. Gen. Laws § 15-1-1 (2013); and Vermont, 2009 Vt. Acts & Resolves 3. Four states, Massachusetts, California, Iowa, and Connecticut, interpreted their respective constitutions to require same-gender marriages. *See In re Marriage Cases*, 183 P.3d at 452; *Kerrigan,* 957 A.2d at 482; *Varnum*, 763 N.W.2d at 904; *Goodridge*, 798 N.E.2d at 968. In three states, Maine, Maryland, and Washington, the electorate voted in favor of same-gender marriages. Ashley Fetters, Same-Sex Marriage Wins on the Ballot for the First Time in American History, theatlantic.com (Nov. 7, 2012), http://www.theatlantic.com/ sexes/archive/2012/11/same-sex-marriage-wins-on-the-ballot-for-the-first-time-in-american-history/264704/ (listing the wording of each ballot proposal). Finally, three states, New Jersey, Illinois, and Colorado, have legislation that grants same-gender couples an alternative to civil marriage and makes available to them many of the benefits granted to married couples. *See* Colo. Rev. Stat. §§ 14-15-102 to -119 (2013); 750 Ill. Comp. Stat. 75/1 to 75/90 (2011); N.J. Stat. Ann. 37:1-28 to -36 (2006).[9] The history we have just recounted demonstrates that the members of the LGBT community do not have sufficient political strength to protect themselves from purposeful discrimination.

**{52}**     To complete the analysis of whether intermediate scrutiny should apply, we must answer whether members of the LGBT community have been subjected to a history of discrimination and political powerlessness based on a characteristic that is relatively beyond their control. *Breen*, 2005-NMSC-028, ¶ 21. This requirement cannot mean that the individual must be completely unable to change the characteristic. *See In re Marriage*

---

[8]Twenty state civil or human rights acts prohibit discrimination against consumers based on their sexual orientation. *See* Justin Muehlmeyer, *Toward a New Age of Consumer Access Rights: Creating Space in the Public Accommodation for the LGBT Community*, 19 Cardozo J.L. & Gender 781, 782 n.11 (Spring 2013).

[9]Held unconstitutional by *Garden State Equal. v. Dow*, ___ A.3d at ___, 2013 WL 5687193, at *2. *See* n.6, *supra*.

*Cases*, 183 P.3d at 442 (recognizing that other classifications such as religion and alienage that receive heightened scrutiny do so despite the fact that individuals can change their religion or become citizens); *Varnum*, 763 N.W.2d at 893 ("The constitutional relevance of the immutability factor is not reserved to those instances in which the trait defining the burdened class is absolutely impossible to change."). Instead, the question is whether the characteristic is so integral to the individual's identity that, even if he or she could change it, would it be inappropriate to require him or her to do so in order to avoid discrimination? We agree with those jurisdictions which have answered this question affirmatively regarding LGBTs. *See Kerrigan*, 957 A.2d at 438-39 (holding that gays and lesbians are entitled to consideration as a quasi-suspect class because "they are characterized by a central, defining [trait] of personhood, which may be altered [if at all] only at the expense of significant damage to the individual's sense of self") (internal quotation marks and citation omitted); *see also In re Marriage Cases*, 183 P.3d at 442 ("Because a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment."); *Varnum*, 763 N.W.2d at 893 (same).

**{53}** Therefore, we conclude that intermediate scrutiny must be applied in this case because the LGBT community is a discrete group that has been subjected to a history of purposeful discrimination, and it has not had sufficient political strength to protect itself from such discrimination. As we noted in *Breen*, to apply intermediate scrutiny, the class adversely affected by the legislation does not need to be "completely politically powerless, but must be limited in its political power or ability to advocate within the political system." 2005-NMSC-028, ¶ 18. Nor does intermediate scrutiny require the same level of extraordinary protection from the majoritarian political process that strict scrutiny demands. *Id*. It is appropriate for our courts to apply intermediate scrutiny, "even though the darkest period of discrimination may have passed for a historically maligned group." *Id*. ¶ 20. Our decision to apply intermediate scrutiny is consistent with many jurisdictions which have considered the issue. *Windsor v. United States*, 699 F.3d at 185; *Kerrigan*, 957 A.2d at 475-76; *Varnum*, 763 N.W.2d at 896.

**It is unclear whether the right to marry is a fundamental right requiring strict scrutiny**

**{54}** Before we proceed to analyze the legislation under intermediate scrutiny, we must address Plaintiffs' argument that a strict scrutiny level of review is required because an individual's right to marry the person of his or her choice is a fundamental right. The opponents of same-gender marriage respond to Plaintiffs' argument by redefining the right pursued by Plaintiffs as being the right to marry a person of the same gender. They contend that the right to marry someone of the same gender is not a fundamental right because it is not deeply rooted in New Mexico history and tradition, nor is it an important constitutional right because no state constitutional provision guarantees such a right. We conclude that the correct question is whether the right to marry is a fundamental right requiring strict scrutiny, which is a question that has not been answered by the United States Supreme Court. For the following reasons, we determine that we do not need to definitively answer this difficult

25

question.

**{55}** Civil marriage is considered to be a civil right. *See, e.g.*, *Loving*, 388 U.S. at 12 ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival.") (quoting *Skinner v. State of Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)). The United States Supreme Court also has described the right to marry as "of fundamental importance for all individuals" and as "part of the fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause." *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978); *see also Loving*, 388 U.S. at 12 ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."). When fundamental rights are affected by legislation, the United States Supreme Court has applied strict scrutiny when determining whether the legislation is constitutional. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). However, regarding marriage, the United States Supreme Court does not demand "that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny." *Zablocki*, 434 U.S. at 386. For example, in *Turner v. Safley*, 482 U.S. 78, 81, 95-97 (1987), the Supreme Court rejected the lower court's application of strict scrutiny to a prisoner's right to marry, noting that the prisoner's fundamental right to marry, "like many other rights, is subject to substantial restrictions as a result of incarceration." *Id*. at 95. In *United States v. Windsor*, the Supreme Court left unanswered the level of scrutiny it was applying to same-gender marriages. ___ U.S. at ___, 133 S. Ct. at 2706 (Scalia, J., dissenting, noting that the majority "does not apply strict scrutiny, and its central propositions are taken from rational-basis cases"). We conclude from the United States Supreme Court's equivocation in these cases that whether the right to marry is a fundamental right requiring strict scrutiny is a question that remains unanswered. We do not need to answer this question here because Plaintiffs prevail when we apply an intermediate scrutiny level of review under an equal protection analysis.

**Denying same-gender couples the right to marry and all of the rights, protections, and responsibilities available under state and federal law does not survive intermediate scrutiny**

**{56}** We will uphold the statutes at issue in this case if the opponents of same-gender marriage can prove that denying same-gender couples the right to marry—with all of its attendant statutory rights, protections and responsibilities—is substantially related to an important governmental interest. *See Breen*, 2005-NMSC-028, ¶ 30. Once the governmental interest is identified, we must balance that interest against the burdens placed on the sensitive class compared to others who are similarly situated. *Id*. ¶ 31. We consider whether the legislation is over- or under-inclusive in its application, and attempt to determine whether the legislation is the least restrictive alternative for protecting the important governmental interest. *Id*. ¶ 32.

**{57}** We have interpreted the argument of the opponents of same-gender marriage as suggesting that there are three governmental interests for prohibiting same-gender couples

26

from marrying in the State of New Mexico. First, they argue that the governmental interest in promoting responsible procreation justifies the same-gender marriage prohibition. Second, they argue that the governmental interest in responsible child-rearing justifies depriving same-gender couples who marry from the benefits and protections of marriage laws. Third, they suggest that allowing same-gender couples to marry will result in the deinstitutionalization of marriage because people will spend a smaller proportion of their adult lives in intact marriages than they have in the past. During oral argument, opponents admitted that they lacked evidence to show that allowing same-gender marriages would result in married couples divorcing at an increased rate. Because this contention is not supported by the evidence in the record, the contention is without merit. *See Wagner v. AGW Consultants*, 2005-NMSC-016, ¶ 24, 137 N.M. 734, 114 P.3d 1050 (the party with the burden of proof in a constitutional challenge must support his or her argument with a "firm legal rationale" or evidence in the record (internal quotation marks and citation omitted)). To the extent that the deinstitutionalization argument was intended to inject into the analysis moral disapprobation of homosexual activity and tradition—that marriage has traditionally been between a man and a woman—both justifications have been rejected.

**{58}**    In *Lawrence v. Texas*, 539 U.S. 558, 582 (2003), the United States Supreme Court made it clear that it has "never held that moral disapproval, without any other asserted state interest, is a sufficient rationale under the Equal Protection Clause to justify a law that discriminates among groups of persons." It is not appropriate to define the State's interest as maintaining the tradition of marriage only between opposite-gender couples, any more than it was appropriate to define the State's interest in *Loving*, 388 U.S. at 12, as only maintaining same-race marriages. Articulating the governmental interest as maintaining the tradition of excluding same-gender marriages because "the 'historic and cultural understanding of marriage' has been between a man and a woman—cannot in itself provide a [sufficient] basis for the challenged exclusion. To say that the discrimination is 'traditional' is to say only that the discrimination has existed for a long time." *Kerrigan*, 957 A.2d at 478.

**{59}**    We are left to decide whether prohibiting same-gender marriage with all of its attendant rights, protections, and responsibilities is substantially related to the purported important governmental interests in "responsible procreation and child-rearing," which we have already indicated are not supported in the history of New Mexico's marriage legislation. It is the marriage partners' exclusive and permanent commitment to one another and the State's interest in their stable relationship that are indispensable requisites of a civil marriage.

**{60}**    We separately consider the purported governmental interests in responsible procreation and responsible child rearing. Regarding responsible procreation, we fail to see how *forbidding* same-gender marriages will result in the marriages of *more* opposite-gender couples for the purpose of procreating, or how *authorizing* same-gender marriages will result in the marriages of *fewer* opposite-gender couples for the purpose of procreating. The discriminatory classification is also glaringly under-inclusive. Discriminatory legislation

is under-inclusive if the classification does not include all of those who are similarly situated with respect to the purpose of the law. *Dandridge v. Williams*, 397 U.S. 471, 529 (1970) (Marshall, J., dissenting). Regarding the purported legislative goal of responsible procreation, the legislation is under-inclusive because the statutes do not prohibit opposite-gender couples from marrying, even if they do not procreate because of age, physical disability, infertility, or choice.[10] Finally, although it is not clear what the opponents of same-gender marriage mean by "responsible procreation," when childless same-gender couples decide to have children, they necessarily do so after careful thought and considerable expense, because for them to raise a family requires either lengthy and intrusive adoption procedures or assistive reproduction.

**{61}** Same-gender couples are as capable of responsible procreation as are opposite-gender couples. We conclude that there is not a substantial relationship between New Mexico marriage laws and the purported governmental interest in responsible procreation.

**{62}** The final issue is whether denying the rights and protections of federal and state laws to same-gender couples who want to marry and have families by adoption or assisted reproduction furthers the State's purported interest in promoting responsible child-rearing. In this case, no one denies that LGBT individuals are fully capable of entering into the kind of loving and committed relationships that serve as the foundation for families, or that they are capable of responsibly caring for and raising children. The 2010 United States Census reported that at that time, there were 111,033 households headed by same-gender couples with their own children residing in their households, and that of those households, 1,038 were in New Mexico. *United States Census 2010* and *2010 American Community Survey, Same-Sex Unmarried Partner or Spouse Households by Sex of Householder by Presence of Own Children*, available at http://www.census.gov/hhes/samesex/files/supp-table-AFF.xls. The New Mexico Court of Appeals has held that "a person's sexual orientation does not automatically render the person unfit to have custody of children." *A.C. v. C.B.*, 1992-NMCA-012, ¶ 19, 113 N.M. 581, 829 P.2d 660. This Court has held that same-gender couples have custody rights to children under the New Mexico Uniform Parentage Act, NMSA 1978, §§ 40-11A-101 to -903 (2009), because, among other reasons, "it is against public policy to deny parental rights and responsibilities based solely on the sex of either or both of the parents." *Chatterjee*, 2012-NMSC-019, ¶¶ 5, 37. The American Psychological Association, which filed a brief amicus curiae in this case, cites to studies indicating that there is no scientific evidence that parenting effectiveness is related to the parents' sexual orientation. *See* M.E. Lamb, *Mothers, Fathers, Families, and Circumstances: Factors Affecting Children's Adjustment,* 16 Applied Developmental Sci. 98-111 (2012); M.E. Lamb

---

[10]It is doubtful that the government could preclude any couple from marrying because they are unwilling or unable to procreate. *See Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.").

& C. Lewis, *The Role of Parent-Child Relationships in Child Development,* in *Developmental Science: An Advanced Textbook* 429-68 (M.H. Bornstein & M.E. Lamb eds., 5th ed. 2005); C.J. Patterson & P.D. Hastings, *Socialization in the Context of Family Diversity,* in *Handbook of Socialization: Theory and Research* 328-51 (J.E. Grusec & P.D. Hastings eds., 2007).

**{63}** We need not go further than the record in this case for persuasive evidence that same-gender parents are responsible parents. As we have previously discussed, many of the Plaintiffs in this case have been in long-term, committed relationships, and many of them are raising or have raised children and grandchildren. Plaintiffs Miriam and Ona have been in a committed relationship for twenty-five years and have raised three children and one grandchild. Plaintiffs A.D. and Greg have been in a committed relationship for seven years and have raised a foster child together. Plaintiffs Monica and Cecilia have been in a committed relationship for fifteen years and have raised three daughters together. Plaintiffs Jen and Angelique have been in a committed relationship for twenty-one years and have raised three adopted sons together, one of whom is serving our country as an enlisted soldier in the United States Army.

**{64}** We fail to see how depriving committed same-gender couples, who want to marry and raise families, of federal and state marital benefits and protections will result in responsible child-rearing by heterosexual married couples. In the final analysis, child-rearing for same-gender couples is made more difficult by denying them the status of being married and depriving them of the rights, protections, and responsibilities that come with civil marriage. Innumerable statutory benefits and protections inure to the benefit of a married couple. We have identified several relating to community property rights in this opinion. *See* §§ 40-3-7 to -17 (1975) (addressing the property rights of "husband and wife"). The New Mexico Probate Code contains other benefits and protections. *See* NMSA 1978, § 45-2-807(a) (1975, as amended through 1993) (one-half of the community property goes to the surviving spouse); NMSA 1978, § 45-3-203(A)(2) (1975, as amended through 2011) (granting priority of the appointment as personal representative to the surviving spouse if the decedent did not nominate a personal representative or exclude the surviving spouse as a devisee). Married persons are granted property exemptions from creditors, receivers, or trustees to preserve essential resources and a home for the family. *See* NMSA 1978, §§ 42-10-1 to -13 (1887, as amended through 2007) (listing types of exemptions). Wrongful death damages are allocated to a surviving spouse when a tortfeasor causes the death of a spouse. *See* NMSA 1978, § 41-2-3(A) (1882, as amended through 2001) (allocating wrongful death damages to the surviving spouse). A spouse has priority to make health-care and end-of-life decisions for an incapacitated spouse, NMSA 1978, § 24-7A-1(G) (1995, as amended through 2009), by virtue of being a spouse, NMSA 1978, § 24-7A-5(B)(1) (1995, amended 1997). Conversely, a member of an unmarried couple must establish the quality and quantity of the relationship with his or her incapacitated partner—issues that frequently become contentious—before he or she can make health-care and end-of-life decisions on behalf of the incapacitated partner. *See* § 24-7A-5(B)(2) ("[A]n individual in a long-term relationship of indefinite duration with the patient" may act as a surrogate to make health-care decisions

29

for the patient.).

**{65}** Children are also both directly and indirectly the beneficiaries of the statutory benefits and protections available to a married couple. Children benefit from the presumption of legitimacy when they are born to a married couple. Section 40-11A-204(A). In the event of separation or divorce, children benefit from orderly child custody proceedings, § 40-4-9; child support, § 40-4-11; joint custody, § 40-4-9.1(B); and the important doctrine which requires courts to consider the best interests of the child. In addition, as we noted in *Chatterjee*, the best interests of a child do not depend on a parent's sexual orientation or marital status. 2012-NMSC-019, ¶¶ 34-37.

**{66}** We have not attempted to provide an exhaustive list of the statutory rights and protections available to a married couple, but the essence of many of the statutes that we have identified is to assist with the stability of the relationship and the safeguarding of important collective resources. The burdens on same-gender couples who want to marry and who are deprived of federal and state benefits and protections, compared to opposite-gender couples who want to marry and are therefore eligible for federal and state benefits and protections, is readily apparent and, if same-gender marriages are not legally permitted, inequitable. The enhanced income and the laws that create financial security for married couples are important sources of stability for a family bonded by marriage. This is evident not only during end-of-life circumstances, but also in the event of a separation or divorce. By denying same-gender couples the right to marry, the Legislature also deprives them of the protections of New Mexico divorce laws. Instead, same-gender couples and their children are forced into courts of equity without the benefit of property division laws, child support, child custody, and visitation laws that minimize uncertainty for the family unit.

**{67}** Excluding same-gender couples from civil marriage prevents children of same-gender couples from enjoying the security that flows from the rights, protections, and responsibilities that accompany civil marriage. There is no substantial relationship between New Mexico's marriage laws and the purported governmental interest of responsible child-rearing. There is nothing rational about a law that penalizes children by depriving them of state and federal benefits because the government disapproves of their parents' sexual orientation.

**{68}** We invited the active participation in this case of amici curiae to ensure that the important issues before us were properly and thoroughly briefed and argued to this Court. The parties and amici have had ample opportunity to articulate a constitutionally-adequate justification for limiting marriage to opposite-gender couples. The supposed justifications for the discriminatory legal classification are categorically at odds with the comprehensive legislative scheme that is intended to promote stable families and protect the best interests of children. Denying same-gender couples the right to marry and thus depriving them and their families of the rights, protections, and responsibilities of civil marriage violates the equality demanded by the Equal Protection Clause of the New Mexico Constitution.

**Remedy**

**{69}**　Having declared the New Mexico marriage laws unconstitutional, we now determine the appropriate remedy.  We decline to strike down our marriage laws because doing so would be wholly inconsistent with the historical legislative commitment to fostering stable families through these marriage laws.  Instead, "civil marriage" shall be construed to mean the voluntary union of two persons to the exclusion of all others.  In addition, all rights, protections, and responsibilities that result from the marital relationship shall apply equally to both same-gender and opposite-gender married couples.  Therefore, whether they are contained in NMSA 1978, Chapter 40 or any other New Mexico statutes, rules, regulations or the common law, whenever reference is made to marriage, husband, wife, spouse, family, immediate family, dependent, next of kin, widow, widower or any other word, which, in context, denotes a marital relationship, the same shall apply to same-gender couples who choose to marry.

**{70}**　With respect to the forms required by Section 40-1-18, gender-neutral language shall be utilized by the Clerks.  Section 40-1-17 states that "the form of application, license and certificate shall be substantially as provided in Section 40-1-18."  Therefore, to comply with the New Mexico Constitution, gender-neutral language shall  be utilized in identifying the applicants and spouses.

**{71}**　We grant a writ of superintending control and order the courts to mandate compliance with the holdings and rationale of this opinion.

**{72}**　**IT IS SO ORDERED.**

_____
　　　　　　　　　　　　　**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**